[No. 6,920.—In Bank.]
December 13, 1882.

## ALVINZA HAYWARD *v.* GEORGE E. ROGERS.

RIGHT OF PLEDGEE OF MINING STOCK AS AGAINST PLEDGOR—ASSUMPSIT—INSTRUCTIONS.—Action to recover a balance alleged to be due on a promissory note and for moneys laid out and advanced for the benefit of defendant. Answer alleging payment by means of a sale by plaintiff of shares of stock of defendant held as security, leaving a balance due defendant and cross-complaint therefor. Rogers, the defendant, contended that Hayward, plaintiff, held a certain number of shares of Savage mining stock as security for money advanced by him to Rogers, and that Hayward, without his knowledge, sold the stock; that afterwards, and while he was ignorant of such sale, Hayward procured a power of attorney from him to sell said stock, and then sold of the stock of the same mining company the same number of shares that he, Hayward, held prior to said first sale as security for his said advances; that Hayward accounted to him for the sum realized on the sale of the stock last sold only, which was much less than the sum realized on the sale of the stock first sold, and which stock, first sold, R. contended was the stock which H. had as such security. On the other hand the plaintiff contended that he constantly held the identical stock certificates which he took as security from the time when he received them up to the time when he admitted he sold them, or that if he did not during all of such time have the identical stock certificates in his posession, that he did, during all of such time, have other stock certificates of the same mining company for the same number of shares, which, during all of such time, he was able, ready, and willing to deliver to the defendant upon his paying the sum for which said certificates were held as security.

*Held:* Taking the defendant's version of the transaction as correct, and the fact that it is not charged in the cross-complaint that he, the defendant, was induced to do what he did, by reason of any representations of the plaintiff as to the condition of the mine, or the then present or prospective value of the stock, or in regard to the quantity of it which other persons were selling, the Court did not err in sustaining objections of the plaintiff to the introduction of evidence of what plaintiff said to the defendant in regard to those subjects.

*Held,* further: The Court did not err in allowing the witness Peart (business manager of the plaintiff) to be asked 'how much stock Hayward carried for Rodgers between certain dates. Peart was better qualified

to answer that question than any other witness, including Hayward himself.

*Held,* further: As to this question to the witness Peart, appellant's counsel seems to have assumed that the answer of the witness would contradict all the evidence to which the objections referred. But as the trial Court could not have anticipated the answer of the witness, there was no error in overruling the objections to the question. No motion was made to strike out the answer; and according to the evidence there is no such contradiction.

ID.—The evidence as to the number of shares of stock that Hayward was carrying for persons other than Rogers, and as to the contents of the letter which Rogers wrote to Hayward, may not have been relevant to any issue in the case, but if error there was in overruling the objections to it, it was error without injury.

CONVERSION OF MINING STOCK BY PLEDGEE.—Upon the main issue in the case, the Court charged the jury as follows: "If you find that Hayward had sold the 690 shares before the execution of the power; that, you remember, was July 13th; and had been ready, able, and willing to transfer to Rogers an equivalent number of similar shares in the same company by a proper and valid certificate, then and in that case it was not material that these facts should be imparted to Rogers at the time he executed the power of attorney, and the power was a valid and binding one. It was not material to tell him that, for the reason that that was a thing that Hayward had a right to do anyway, and the law says, that he was selling his own stock, and not Rogers' stock, provided he was all the time able, ready, and willing to respond to Rogers, in case he should come and demand his stock. And if you find that Hayward had sold the identical 690 shares, and that he was not at the time of such sales able, willing, and ready to deliver to Rogers a similar number of shares, then, and in that case, the suppression of those facts operated as a fraud upon Rogers and destroyed the force and effect of the power of attorney, there being nothing for the power to operate upon."

*Held:* This was a correct and sufficiently clear exposition of the law applicable to that issue, and it obviated the necessity of the Court's giving any other or further instructions upon it. Therefore the refusal of the Court to give the instructions asked on the points covered by the instruction given, is not a sufficient ground for reversing the judgment.

WHEN JURY MAY NOT DISREGARD EVIDENCE OF WITNESS.—The Court also charged the jury as follows: "When facts are testified to by witnesses who are not impeached, and there is no inherent improbability in the statement, the jury are bound to take that evidence as proving the particular fact; and the jury have no right capriciously to disregard evidence where it is not controverted and the character of the witnesses is good, and the story is probable."

*Held:* Though there should be no necessity for such an instruction, still as a matter of law the instruction is correct.

JUDGMENT MODIFIED TO CORRESPOND WITH VERDICT.—The jury found for the plaintiff in the sum of $295,345.38, and the judgment was entered for the sum of $305,650.95.

*Held:* The judgment should be modified so as to correspond with the verdict of the jury.

APPEAL by the defendant from the judgment of the District Court of the Nineteenth Judicial District of the State of California in and for the City and County of. San Francisco. WHEELER, J.

Action on promissory note, and on account of moneys laid out and advanced for benefit of defendant. The complaint was filed February 25, 1876. An amended complaint was filed September 8, 1876, and prays judgment against defendant for the sum of $30,000, and interest thereon at one per cent. per month, compounded monthly, from June 4, 1872, to December 2, 1872; and from that date on $20,278.44, alleged to be due on a promissory note of defendant to plaintiff, executed June 4, 1872; and for the sum of $179,201.56, and interest thereon at the rate of ten per cent. per annum from April 14, 1874, for moneys paid out and advanced by plaintiff for benefit of defendant, and costs of suit. The defendant, on the twentieth day of July, A. D. 1876, filed his original answer and cross-complaint, which pleadings of the defendant were twice amended. The defendant set up payment of the indebtedness and the stock transactions between himself and the plaintiff, referred to in the opinion of the Court and also in the instructions given and refused, hereinafter set forth. The plaintiff answered and denied the cross-complaint. On the trial of the action, the Court instructed the jury as follows:

"Gentlemen of the Jury: This case, which is about now drawing to a close, as you have observed, is one involving a large amount, not only when viewed from the standpoint of the plaintiff's claim, but also when we consider the cross-bill or cross-complaint that the defendant makes. This, the magnitude of the case, at first almost startles the jury and the Court; but that should simply amount to this, to insure upon the part of the jury a very careful consideration of the evidence, and also a careful attention to what the Court may declare to you to be the law of the case; for with the law the jury have nothing to do, nor has the Court. We take it from writers upon the subjects and also from the declaration and interpretation of the law as laid down by the higher Courts of the land; and where our own Supreme Court has laid

down the law in a given case, that becomes binding upon this Court, and it follows that it is the duty of this Court, in administering the law in cases where it has been settled in the Supreme Court, to state it to you as that Court has declared; and it is your duty, without any regard to any affections or sympathy or any other motives that may control you, to pay a strict attention to that law, and to shape your verdict accordingly.

"This case briefly stated, is an action on the part of Hayward, the plaintiff, to recover from the defendant a balance alleged to be due for moneys laid out and advanced for the benefit of the defendant, and at his request; the sum that it is shown that he advanced, is $267,667.25; this includes the assessments that were paid by him from time to time upon the stock that he held for Mr. Rogers; concerning this gross amount there seems to be no difference of opinion; there seems to be no contest here in the case; Hayward then gave Rogers credit for the amount of $68,000, and odd dollars, which grew out of the sales which he alleges he made, in November, 1872, of something about $55,000, and also the sale of April 14, 1874, for $12,000. Those two sums added together making an aggregate of $68,000, which the plaintiff deducts from his $267,000, which he had advanced, leaving a balance of $199,591.87. Upon that sum the plaintiff claims interest according to various rates, as expressed in different promissory notes and so forth, and claims that now there is a grand total of $295,349.38.

"The computation of the interest has been made in your presence, and I do not understand that there is any controversy upon that subject—relying, I suppose, upon the familiar rule that figures do not lie; and I believe the respective attorneys for the parties do not disagree upon that computation. Then it stands thus, gentlemen, that if the defense that is set up in this case, if you should determine that it amounts to nothing under the law and the evidence, then your verdict would necessarily be for the plaintiff in that sum, two hundred and ninety-eight thousand dollars, or thereabouts, and if there were no counter-claim set up by the defendant, the case would be made plain, and that would be the result, and that would necessarily be your verdict, for when facts are testified

to by witnesses who are not impeached, and there is no inherent improbability in the statement, the jury are bound to take that evidence as proving the particular fact; and the jury have no right capriciously to disregard evidence where it is not controverted and the character of the witnesses is good and the story is probable.

"But under this case thus made out the defendant claims that between April 21 and May 14, 1872, the plaintiff sold of his stock five hundred and seventy shares, for the aggregate sum of three hundred and eighty-seven thousand six hundred dollars; that between July 6th and July 13th; and July 13th is a point in the case, that being the day on which the power of attorney was executed; he claims that between July 6th and July 13th the plaintiff sold one hundred and twenty shares more, for which he realized twenty-four thousand dollars, and that on April 14, 1874, he sold one hundred and ninety shares more, that is what is called the Hall stock, for the sum of twelve thousand and odd dollars, thus making an aggregate of receipts of four hundred and twenty-three thousand seven hundred and seventy-six dollars. Of course, if this claim should prevail, it would result in a verdict in favor of the defendant; after deducting or making the proper allowances for interest and so forth, I believe the attorney for the defendant claims it would aggregate now about two hundred thousand dollars. Those are the figures in round numbers, so far as the claims of the different parties are concerned.

"Now, as to the transaction itself, it appears from the evidence, that in the spring of 1872, about April 22d, that Hayward took up for Rogers a large amount of stock and 'carried it' for him, as the phrase runs among brokers and business men. The evidence of Rogers is, that there was nothing said about the terms upon which he was to carry it; there was nothing said about the rate of interest, nor about the time when he was to pay Hayward, nor, he says, did he give Hayward any power of sale; on the other hand, Hayward testifies that he made this advance upon the sole and express condition that he was at liberty to deal with the stock as his own, to sell it when and where and as he pleased.

"The evidence upon that point, then, of course, is contra-

dictory; but it is not a material matter, for the reason that if Hayward is chargeable with the sale of the stocks made at high figures in April and May, then Rogers would be entitled to that credit, and Rogers does not repudiate that sale, but in substance ratifies it, and seeks the benefit of the sale for the very plain reason that the stock has never reached so high a figure since. If Hayward had no authority to sell the stock, and he had sold it at low figures at that time, and the stock had since that risen to a higher figure, as a general rule, the pledgor, which is Rogers, could have recovered from the wrong-doer the highest market price of the stock between the day of the sale and the day of trial.

"I charge you, then, that the relation of Hayward and Rogers was that of pledgor and pledgee, and if you find that there was no agreement between them at the time the stock passed into Hayward's hands, authorizing Hayward to sell the stock, then he had no right to sell it without first demanding payment of Rogers and giving him due notice of the sale.

"Now comes the question, gentlemen, as to whether the sale by Hayward of the identical certificates that Rogers left with him was a breach of Rogers' rights. In other words, whether Rogers has the right to claim the high price at which Hayward is alleged to have sold those particular certificates during April and May. The Supreme Court of this State, in a case which arose some years ago, after very elaborate consideration, and in which all of the Judges agreed, and upon a petition for rehearing having been granted and the case heard again, they all agreed again in the first decision, held that one certificate of stock is as good as another; that all shares of stock are alike; and that if the pledgee of the stock, that is Hayward, holds himself at all times ready and able and willing to deliver to the pledgor, upon demand, an equal number of similar shares in the same company, he has the right to do that, and the pledgor is not injured by the fact that the pledgee sold the particular certificates.

"I, therefore, charge you that if you find that Hayward did sell and deliver the identical 690 shares before July 13, 1872, without authority from Rogers, he would not there-

by become liable to Rogers beyond nominal damages, if he was at all times ready, able, and willing to transfer to Rogers an equivalent number of similar shares in the same company by a proper and valid certificate. I hope the jury understands this proposition, because it is the leading and important point in this case; and this decision of the Supreme Court, while it did not meet the approbation of the entire profession, is still not a new decision; the same doctrine, precisely, was laid down by Chancellor Kent, more than fifty years ago, in the case where bank stock, of the old United States Bank, had been pledged with a broker of the city of New York; and it stands precisely as if one of you had stored with a warehouseman a hundred bushels of wheat, and he had placed it in with a thousand bushels more of his own, in bulk, not sacked or in barrels, but had been emptied into one vast bin; now, the warehouseman would have the right to go on selling the wheat from that amount in bulk; and, although he might happen to sell the identical hundred bushels you had deposited, it would not be any wrong to you, providing he always kept on hand a hundred bushels of wheat of the quality and character, which he was ready to deliver to you on demand. Probably that is all that is necessary to say on that point; but I wish you to clearly understand it, as the case must necessarily turn upon that question.

"I instruct you further, that inasmuch as Rogers never made any demand on the plaintiff for his stock before July 13th, and never directed him to sell any, the plaintiff was at liberty, as he sold stock from time to time from the mass of shares on hand, to credit such sales to such particular account as he pleased; and that doctrine finds analogy in the case where a man is owing you upon two accounts, or upon a note and account, and he meets you and says: 'Here is a hundred dollars towards what I owe you.' You are at liberty to apply it upon the note, or to apply upon the account, as you see fit; if he gives no directions to the contrary, or rather, if he does not specify upon which particular account or indebtedness he intends the money to apply, you can place it to whichever you choose. So in this case, if you find that Hayward had a large amount of Savage stock on hand, and he sold from time to

time, he had the right, until a demand was made by some pledgor, or a direction from some pledgor for him to sell, he had the right to credit to such accounts as he pleased during his sales from time to time. Of course, gentlemen, it is for you to determine if these credits were made in good faith, and if they were made about the time of the sales. You will remember that the books were given in evidence, and there were various sales made between April and July 13th, and the balance was made at the end of each month, showing that the 690 shares were always to the credit of Rogers in those statements; it is for you to determine, of course, whether that was a truthful and fair statement of the transaction. If you find that Hayward had sold the 690 shares before the execution of the power, and that at all times from April 22d to July 13th, he had been ready, able, and willing to transfer to Rogers an equivalent number of similar shares in the same company by a proper and valid certificate, then and in that case it was not material that these facts should be imparted to Rogers at the time he executed the power of attorney and the power was a valid and binding one.

"Now upon that point the rule is, that when a man in his senses, in the possesion of his faculties, deliberately executes a written agreement, he is presumed to have understood the agreement and is bound by its terms unless there was fraud, or mistake, or surprise, or something of that kind, that unfairly prevented him from knowing what he was doing; as for instance, if a man who is unable to read, signs a document, and it is read to him, but falsely read, a portion is suppressed or something is put in that is not there, in reading, and signs it, he is not bound, because he was imposed upon; or if a man is blind and an instrument is misread to him and he executes it, he is not bound by it. So if there is any suppression or misstatement of a material fact, and through which a party is led innocently to sign an agreement, that amounts to what the law calls a fraud, and he is not bound by it.

"I therefore have charged you that if Hayward—and will read this again now, that you may better understand it: If you find that Hayward had sold the 690 shares . before the execution of the power; that, you remember, was July 13th,

and had been ready, able, and willing to transfer to Rogers an equivalent number of similar shares in the same company by a proper and valid certificate, then and in that case it was not material that these facts should be imparted to Rogers at the time he executed the power of attorney, and the power was a valid and binding one. It was not material to tell him that, for the reason that that was a thing that Hayward had a right to do anyway, and the law says, that he was selling his own stock, and not Rogers' stock, provided he was all the time able, ready, and willing to respond to Rogers, in case he should come and demand his stock. And if you find that Hayward had sold the identical 690 shares, and that he was not at the time of such sales able, willing, and ready to deliver to Rogers a similar number of shares, then, and in that case, the suppression of those facts operated as a fraud upon Rogers and destroyed the force and effect of the power of attorney, there being nothing for the power to operate upon.

"As to the other defense; the defense that is made to Rogers' cross-bill, namely, the Statute of Limitations. I will simply state that it is conceded that if Rogers knew all of these circumstances more than three years before he filed his cross-bill, then this defense of his is barred by the statute: 'An action must be brought within three years, if it relies on the ground of fraud or mistake; the cause of action in such case is not to be deemed to be accrued until the discovery by the aggrieved party of the facts constituting the fraud or mistake.' Now, if Rogers discovered this fraud that he alleges Hayward perpetrated on him more than three years before he filed his cross-complaint in this case, then his action is barred, and you must pay no attention to the defense.

"Actual notice of these facts is not always necessary: 'Notice is, first, actual, which consists in express information of a fact; second, constructive, which is implied by law.' This is the section to which I call your attention now: 'Every person who has actual notice of a circumstance sufficient to put a prudent man upon inquiry as to a particular fact, and omits to make such inquiry with reasonable diligence, has constructive notice of the fact itself.'

" I have been asked to charge you, that the rendition of the account by Hayward, in August, 1873, showing all these sales,

was a circumstance that should be taken into consideration in determining the question as to whether Rogers did have notice of those frauds more than three years before the filing of his cross-bill; and I instruct you, of course, that that is a circumstance that you are at liberty to take into consideration; the evidence being that Hayward rendered him an account of sales in August, 1873, and by that account it appeared that the whole 690 shares was sold after the power of attorney, and in the month of November, 1872, realizing some 55,000 and odd dollars.

"Here are two instructions that I give you at the request of defendant's counsel: 'That when an agent is dealing with the principal, or a trustee with the beneficiary of his trust, it is his bounden duty to see that everything is fair, and that the principal or beneficiary has all the information as to the matters of fact necessary, to show him his precise situation in relation to the business on hand.' Second. 'It is no defense or excuse to the plaintiff, that stockholders have a custom amongst themselves, in the delivery of shares of stock to persons with whom they deal, to deliver any certificate they see fit.' This, of course, was not a transaction between two brokers, and it is clear that Mr. Rogers' rights are not to be determined, nor Mr. Hayward's either, by the rules that this limited and private association, known as the Board of Brokers, have among themselves.

"Now, gentlemen, I have endeavored to state to you plainly the principles upon which this case is to be decided, and you will observe that the case pretty much turns, indeed it does turn, upon the main question: that is, if you find that Hayward sold those shares before July 13th; as to whether he was during all of those times, able, ready, and willing to deliver Mr. Rogers his 690 shares at any time that he might call for them, if he should call and pay Hayward the money he had advanced, if he was ready to respond, then Hayward did precisely what the law says he may do; he sold the stock, and he had a right to sell it, for his own account or for any account that he pleased, so long as he retained the proper number for Rogers, to give him upon demand.

"Now, gentlemen, the law makes you the judges, the exclusive judges, of all matters of fact; and it is for you to

determine, wherever there has been a conflict, upon which side the truth lies; and you are to judge from the appearance of men, and you have a right to take into consideration their demeanor upon the witness stand, their interest in the event of the suit, the probabilities of their statements and all of the surrounding circumstances, and to give such verdict, under that evidence, as your consciences and judgments may dictate. The fact that the case is large, should make you careful; but should not deter you from rendering such a verdict as you think the evidence, as given before you, and the law as given you by the Court, will justify.

"Gentlemen, the case is now with you for your consideration."

Among others refused, the following instructions were asked by the defendant, and refused by the Court:

"If the jury believe from the evidence that the plaintiff sold certificates of Savage stock received by him for the defendant, at any time prior to his procurement of the power of attorney produced here, without the authority of the defendant, it makes no difference how much Savage stock the plaintiff had on hand belonging to persons other than himself, or belonging to Hayward & Jones."

"If the jury believe from the evidence, that at the time when the plaintiff procured the power of attorney produced here, he did not communicate, or cause to be communicated to the defendant, that he had sold or otherwise disposed of any of the certificates of Savage stock he had received for the defendant, and that the defendant was then ignorant of the fact that the plaintiff had so sold any of the said certificates, they will not take the said power of attorney further into consideration."

"If it appears from the evidence that the plaintiff, at any time prior to the procurement of the power of attorney produced here, sold without the defendant's consent any certificates of Savage stock received by him for the defendant as security for money loaned the defendant, and that that power was prepared by the plaintiff, or his agent or agents, without any suggestion as to the numbers of and upon the certificates therein described and identifying the same, and that the

defendant did not then know that the plaintiff had so sold any of the said certificates, then that power is void."

"If the defendant, when he executed the power of attorney produced on this trial, did not know that the plaintiff had sold any of his certificates of Savage stock, then that power is void."

"It makes no difference as to the validity of the power of attorney produced on this trial, whether the plaintiff or his manager, Peart, knew that the plaintiff had sold any of the certificates of Savage stock belonging to the defendant or not, at the time when that power was procured."

"It makes no difference whether the plaintiff placed as many shares of Savage stock as he had sold of the defendant's in an envelope, or otherwise segregated such a number for the defendant or not, unless the shares so replaced, belonged to the plaintiff."

"If the jury believe from the evidence, that nothing was said as to the plaintiff having power to sell the stock to be delivered him for defendant at the time when the plaintiff agreed to advance him moneys upon the same in April, 1872, and that before the power of attorney produced on this trial was executed, the plaintiff sold any of the certificates of Savage stock received by him for the defendant, and that the defendant did not, at the time he executed said power, know that the plaintiff had sold any of the said certificates, and that, thereafter, there ever was a time when the plaintiff did not have as many shares of Savage stock on hand of his own, then the defendant is entitled to recover of the plaintiff the highest market value of Savage stock at the time or times when the plaintiff so sold the said certificates, or any of them, for as many shares as the plaintiff did not always have and keep on hand."

"If the defendant delivered shares of stock to the plaintiff as collateral security for money loaned, and no further stipulation was made between them, the plaintiff had no right to sell the same or any part of the same, without first demanding the money due him, or, in case of default in payment, without giving notice when and where he would sell the said shares at public auction."

"It is not enough for one who has sold certificates of stock

belonging to another, without his consent, to produce and
offer the owner an equal number of shares of the same stock,
but the party who so sold must have always had on hand of
his own that number of shares."

"It is no defense for the plaintiff that his books bore the
right number of shares of stock to the credit of the defendant
during the time he was responsible to the defendant for that
number of shares, but it must appear that the plaintiff had in
his possession, or under his absolute control, that number of
shares of his own all that time."

The verdict and judgment were for the plaintiff. The de-
fendant took this appeal and brought up the evidence in a
bill of exceptions. After the decision in bank a petition for
rehearing was presented by the appellant and denied by the
Court.

*Calhoun Benham, McClure, Dwinelle & Plaisance,* and *H.
K. Moore,* for Appellant.

The third assignment of error is as follows: "The Court
erred in telling the jury, as it did, that when facts are testi-
fied to by witnesses who are not impeached, and whose state-
ments involve no inherent improbability, the jury are bound
to accept them as proved." To tell the jury they were bound
to accept the facts referred to as proved, at the point and in
the connection when they were so told, evinced partiality.

The fourth assignment of error is as follows: "The Court
erred in allowing a witness to be asked, against the defend-
ant's objection, whether there were other persons or not for
whom the plaintiff was carrying stock while he was carry-
ing stock for the defendant." The question was irrelevant.
To let the jury know Hayward was carrying stock for others
was calculated to mislead them by suggesting that he was
thereby able to respond for Rogers' shares with shares of
those other persons.

The fifth assignment of error was as follows: "The Court
erred in allowing Hayward, when on the stand as a witness,
to state, against defendant's objection, the contents of a letter
received from the defendant before the suit was brought,
asking him for a loan, and expressing, according to the wit-
ness, his dissatisfaction with the transaction they had with

each other in the Savage stock." The matter elicited was irrelevant, and calculated and intended to hold the defendant up to contempt and prejudice him with the jury.

The sixth assignment of error is as follows: "The Court erred in allowing Peart, a witness, to be asked, against defendant's objection, how much stock the plaintiff carried for Rogers during the period beginning April 22, 1872, and ending November, 1872." The question involved a conclusion of law. It made the witness judge of what "carrying" was, and the answer that Hayward carried the proper number of shares for Rogers until November, 1872, allowed as it was, formally authorized the jury so to find. It decided the whole case.

The evidence referred to in the seventh and eighth assignments of error was improperly excluded. Those assignments are as follows: "The Court erred in refusing to allow the defendant to prove that the plaintiff, repeatedly, before the break in Savage stock of that year, and after April 22, 1872, told the defendant that the Savage mine was a good mine— was very valuable; that the stock was sure to reach $1,000 a share; that it could not get below $500 a share, as he would take it all rather than it should go below $500 a share."

"The Court erred in refusing to allow the defendant to prove that the plaintiff told the defendant, after April 22, 1872, and before the break in Savage stock of that year, that the Savage mine was very rich, and that the developments in it on certain levels were better than they were in Crown Point, and that the Savage was a better mine than Crown Point, which had been a very rich mine."

The evidence showed Hayward had sold the identical certificates belonging to Rogers, calling for one hundred and twenty-five shares, about the time he received them from Rogers, and if we had been allowed to prove that at that very time he was encouraging Rogers to hold and not to sell, it would have had a tendency to prove he was executing a plan which involved his selling at the same time all the other certificates he got from Rogers.

It is true the fact Hayward talked to Rogers about the mine in such a way as to dissuade him from selling is not alleged as the means employed by Hayward to induce him to

believe the stock was still on hand; but it is not necessary to allege in a complaint all the circumstances of fraud, and if the complaint was faulty in not alleging any act Hayward did to conceal the sales he was making, it should have been demurred to on that ground. (*Kenyon* v. *Woodruff*, 33 Mich. 313, 314.) It is plain for any one to see that Hayward could not have found a better mode of keeping Rogers from thinking he was selling Savage, or that he was selling Rogers' Savage or had already sold it, than to speak in such exalted terms of the wealth of the Savage mine as it was proposed to prove he did. So artful a concealment of those sales combined with so artful a prevention of sales by Rogers would have had the strongest tendency to prove that Hayward's sales were purposely made to defraud Rogers.

But more has been said about this matter than is necessary. This is a case of constructive fraud, and all that is necessary in pleading therefore is to allege the confidential relation, and the unfairness of the transaction, and that it was effected by means of those relations, and then the onus to vindicate the transaction is fixed upon the confidant, and the plaintiff may offer such matter in rebuttal as there may be, if not alleged in the complaint. (*Rubidoex* v. *Parks*, 48 Cal. 215; *Rhodes* v. *Bate*, 1 L. R. Ch. App. 256.)

The twelfth assignment of error is as follows: " The Court erred in allowing Peart, a witness for the defendant, to be asked, in rebuttal, whether he did not have six hundred and ninety shares of Savage stock belonging to the plaintiff in his possession, from April 22, 1872, to the time of the sales stated in the account rendered the defendant by the plaintiff, over and above all joint account stock (Hayward & Jones) and all stock held for parties other than defendant, plaintiff himself, and Hayward & Jones." The question involved a question of law. The evidence showed incontestably and without conflict, or attempt at conflict, that Hayward sold one hundred and twenty-five shares of the defendant's stock about the end of April, 1872; that is to say, he sold the identical certificates for that many shares which he had received from Rogers.

Assuming that he set apart other certificates for the same quantity of stock for Rogers' benefit, it was not for Peart to

say they belonged to Rogers. The question sought to elicit testimony contradicting the witness himself and Hayward's books offered by himself.

Peart testified that those books were correct, and Sell, plaintiff's book-keeper, testified that they contained all Hayward's stock transactions, and they showed that Hayward received no Savage from any one but Rogers in the interval between April 21, 1872, and May 1, 1872, during which he sold certificates belonging to Rogers for one hundred and twenty-five shares, if he did not sell all of the certificates belonging to him; and it is a mathematical demonstration that if Rogers' stocks which were sold in that interval were replaced during that interval, it was done with the stocks of the pledgees, or of Hayward & Jones.

The question was deep and astute. It was so framed that, when it was answered in the affirmative, as it indicated to the witness, by its leading character, it was to be, and in fact was, it should appear to be proved that Hayward had always on hand for Rogers equivalent stock of his own until he sold out under the power of attorney, as he claims to have done. But the answer did not so prove. All it did prove was, that Rogers' credit was always kept standing and some other credit diminished whenever any of Rogers' shares were sold, or whenever any certificates from the envelope affected to his use were sold. If some of the stock in Hayward's hands credited to Hayward & Jones, or some of the stock credited to some person other than Rogers, was not put in lieu of certificates taken from Rogers' envelope, there was no effort to make the books and the envelope concur, to show the true status of each account. We know, if Peart told the truth, that some certificates were sold from Rogers' envelope; because he must have put what he got for Rogers in it when he first got them, and because the proof is direct that some of the certificates received from Rogers were sold by Hayward as soon as they were received.

The first instruction asked for by defendant should have been given.

The second instruction asked for by the defendant ought to have been given. It is as follows: "If the jury believe from the evidence that the plaintiff sold certificates of Sav-

age stock received by him for the defendant, at any time prior to his procurement of the power of attorney produced here, without the authority of the defendant, it makes no difference how much Savage stock the plaintiff had on hand belonging to persons other than himself, or belonging to Hayward & Jones."

There was evidence on the part of the defendant to show that the plaintiff sold some of the certificates delivered to him on the defendant's account, and tending to show he sold all of them, within a few days after he got them, and when they commanded about seven hundred dollars a share, and when he had no stock at all.

And the evidence on behalf of Hayward showed that he had in his possession a great deal of stock belonging (some of it) to persons other than the defendant, and to the firm of Hayward & Jones, of which Hayward was a member. The defendant had no dealings with that firm. The defendant pledged his stock to Hayward, not to Hayward & Jones, and borrowed from him, not from Hayward & Jones. Hayward & Jones could not have been made liable to Rogers. (*Adams et al.* v. *Sturges et al.*, 55 Ill. 468.) It was contended for Hayward that he could screen himself from liability to the defendant if he had as much stock of persons other than himself in his mere physical possession during the continuance of his liability, as he had sold of Rogers'. Such a position is not law.

Even *Atkins* v. *Gamble*, 42 Cal. 86, requires that the party disposing of the certificate of another shall have as good a one of his own at hand. But *Atkins* v. *Gamble, ut supra,* ought not to be followed. It has never commanded the respect of the profession nor of other Courts. (*Parsons* v. *Martin,* 11 Gray (Mass.), 111; *Morton* v. *Preston,* 18 Mich. 60.) Rogers has no fight with *Atkins* v. *Gamble.* It is even authority for him. But overrule it, and every supposed difficulty of his case is leveled.

The third, fourth, fifth, and sixth instructions asked for by defendant should have been given. (*Rubidoex* v. *Parks,* 48 Cal. 215.) The insertion of the numbers of certificates in the power of attorney tendered to Rogers at a time when Hayward knew Rogers did not know the numbers the certificates

he had pledged to him bore, was a positive act of fraud; but it was enough to invalidate the power anyhow if Rogers executed it while in ignorance—no matter how brought about—that his stock, or any of it, had been already sold.

The twelfth instruction asked for by defendant should have been given. There was evidence tending to prove that the plaintiff held the defendant's stock in pledge pure and simple, and he had therefore no right to sell in the Stock Board of the Merchants' Exchange of San Francisco, or without notice; and it was proper the jury should have been told so, and they were not. (*Dent* v. *Holbrook*, 4 P. C. L. J. 549; *Tully* v. *Tranor, ut supra; Parsons* v. *Martin, ut supra; Briggs* v. *B. & L. R. R. Co.*, 6 Allen, 252.)

The instruction numbered thirteen and a half should have been given. The evidence showed that the plaintiff had stock belonging to the defendant in pledge, and sold it without authority, and did not keep on hand a single share belonging to himself or anybody else after a given day, and for a very long time before the defendant filed his cross-complaint demanding satisfaction for the conversion, during all which there was no pretense of a defense if the power of attorney was fraudulently obtained.

The evidence showed that the plaintiff never had at any time but 25 shares of Savage of his own, and that even the Hayward & Jones account of Savage stock resulted in Hayward's never getting a share out of it; that the adventure was a dead failure, and resulted in loss. So that if the interest Hayward had in the Hayward & Jones stock was his shield against the defendant, he protected himself with what had no existence at the time nor ever afterwards, by the mere physical possession of stock, none of which ever came to him on settlement with his partner. (*Cal. Furniture Co.* v. *Halsey, ut supra.*)

The circumstance that the certificates were indorsed so as to pass title to the holder, if indorsement would have that effect, did not vest the legal title to the certificates in Hayward. He was a mere pledgee of the certificates. He held them by virtue of a lien upon them. Whatever the condition they were in may have been, he had only a lien upon them. He held the legal title *quoad* third parties; but *quoad* Rogers he had

only a lien. (*Wilson* v. *Little*, 2 Coms. (N. Y.) 447; *Morton* v. *Preston*, 18 Mich. 69.)

The sixteenth assignment of error is as follows: "The Court erred in charging the jury, as it did, that the defendant could not recover of the plaintiff, for the conversion of his stock, if he was always ready, able, and willing to replace such as he may have converted, if any, without at the same time informing the jury, as it did not, that to be ready and able in law to replace such stock, was to have as many shares of his own, free and unincumbered, on hand, and under his instant control, as he had so converted, and that to have had shares of third parties in his hands, was not sufficient as a defense as against such conversion."

The instruction is but a repetition of the cardinal error which runs through the case. What has already been said in preceding points sufficiently explains our views in regard to it. It would permit a party who could buy stock in the market to sell his pledge whenever he saw fit, and thus to speculate on his pledgor—which he may not do. The principle of *Atkins* v. *Gamble* (42 Cal. 86) is, that shares of stock are intellectual entities unsusceptible of identification, and may therefore be treated as coins not in a bag; but the operation of that principle is carefully guarded by the *proviso,* that a pledgee shall not *speculate* upon his pledgor. The *proviso,* he shall have as many shares of his own on hand when he disposes of his pledgor's as he so disposes of, means nothing else.

The twenty-ninth assignment of error is as follows: "The Court erred in saying to the jury what it did about notice sufficient to put the parties upon inquiry, and omission to make inquiry." The Court instructed the jury on the point of notice as follows: "Actual notice of these facts is not always necessary: 'Notice is, first, actual, which consists in express information of a fact; second, constructive, which is implied by law.'"

"This is the section to which I call your attention now: 'Every person who has actual notice of a circumstance sufficient to put a prudent man upon inquiry as to a particular fact, and omits to make such inquiry with reasonable diligence, has constructive notice of the fact itself.'"

However good law this may be, it was inapplicable, and calculated to mislead the jury. The case was one in which constructive notice could have no effect. The relation of principal and agent existed, and the principal was not required to pursue any inquiry. He reposed on his agent's fidelity. Before he could be held to have knowledge of the alleged fraud, it should have been proved he had actual knowledge of the facts constituting the fraud. What the Court said relieved the plaintiff of that onus as to proof, when it belonged to the plaintiff and threw it on the defendant. (*Pence* v. *Langdon*, 99 U. S. S. C. Rep., 9 Otto, 578; *Sears* v. *Shafer*, 2 Seld. 268; Civil Code of Procedure, § 1869; *Shannon* v. *White*, 6 Richards Eq. R., S. C., 96; *Basset* v. *Nosworthy*, 2 Leading Cases in Equity, 1; *Boone* v. *Chiles*, 10 Pet. 210; *McLure* v. *Ashby*, 7 Richards Eq. R. 439; 23 Iowa, 66; 30 id. 375; 4 Strobh. 155; *Pease* v. *Barbiers*, 10 Cal. 436.)

The judgment must be reversed because it calls for $305,-050.95, with interest thereon, and $422.50 costs, when the verdict it recites was $295,345.38.

*Estee & Boalt,* for Respondent.

There was no fraud even if plaintiff, as the agent, pledgee, or trustee of defendant, had sold the stock of the latter without his consent, if he was at all times ready, able, and willing to turn over on demand an equal quantity of similar stock. The Court below held that the relations of pledgor and pledgee existed between these parties, and upon that opinion was compelled to declare the law as laid down by this Court in *Atkins* v. *Gamble*, 42 Cal. 86.

That decision goes to the merits of this case, and is the law of this case upon the assumed proposition that Hayward, this plaintiff, was the pledgee of the stock in controversy, and the charge of the Court to the jury upon the law of the case, was practically an extract from that decision. So that practically the errors assigned by the defendant to the Court below are errors of this Court, and a favorable consideration thereof would result in overruling that case. The case at bar is much stronger than *Atkins* v. *Gamble*.

It was conceded in that case that the plaintiff was the owner of the stock and had himself deposited it with the defendant,

who thereupon became the pledgee thereof.  And the Court held that although the owner of personal property which has been wrongfully converted is ordinarily entitled to recover his specific property, or its value, and can not be compelled to accept other property of the same kind and equal value in lieu of that which was converted, yet shares of stock in a corporation stand upon a different footing, and if all the shares are of equal value, there can be no reason for preferring one share to another.

Indeed, as the Court remarked, the stockholders in a corporation are the joint owners of the franchise and property of the corporation.  Each holder is entitled to an undivided share in the assets and business of the corporation.  All stand upon the same footing.  This same view was entertained by the Supreme Court in two other cases, viz.: *Hawley* v. *Brumagim*, 33 Cal. 394; *Hardenbergh* v. *Bacon*, id. 365. Chancellor Kent in the case of *Nourse* v. *Prime*, 7 Johns. Ch. 87, was of the same opinion as this Court in *Atkins* v. *Gamble.*

The plaintiff in this case was the owner of certain shares of U. S. Bank stock, which he deposited with defendant as collateral for the payment of his note; and if the note was not paid the stock was to be sold, the note paid out of the proceeds, and the balance turned over to the plaintiff.  The stock was sold afterwards at a depreciated price, and the sale did not realize enough to pay the debt; so the pledgee brought suit to recover the deficiency.

The pledgor, however, filed his bill in equity to enjoin the action at law, on the ground that the pledgees were large operators in stocks, and had mingled his stock with their own and other stocks which they held in trust, in such a manner that they could not be distinguished, and that it was the duty of the defendants to have set apart the pledgor's shares in such a manner that they could be identified; and not having done so, they were liable for the highest price at which the stock could have been sold.

The opinion of the Court was adverse to the plaintiff in the equity suit, on the ground that under the contract all that plaintiff could demand was a return of 430 shares of the bank stock; that if he desired to have any specific 430 shares he

should have so provided in the contract. The learned Chancellor approves the opinion of Lord Chancellor Parker in *Le Croy* v. *Eastman*, 10 Mod. 499, in a similar case, to the effect that the defendant was accountable only for the stock and dividends, and not for the price at which the stock was held. (See also *Horton* v. *Morgan*, 6 Duer, 56; *Gilpin* v. *Howell*, 5 Penn. St. 42; *Allen* v. *Dykers*, 3 Hill, 593.)

SHARPSTEIN, J.:

The principal contention on behalf of Rogers is, that Hayward held a certain number of shares of mining stock as security for money advanced by him to Rogers, and that Hayward, without the knowledge of Rogers, sold said shares of stock, and that afterwards, and while Rogers was uninformed and ignorant of said sale, Hayward procured a power from Rogers to sell said stock, and then sold of the stock of the same mining company the same number of shares that he, Hayward, had held prior to said first sale as security for his said advances to Rogers, and that Hayward accounted to Rogers for the sum realized on the sale of the stock last sold only, which was much less than the sum realized on the sale of the stock first sold, which Rogers contends was the stock which Hayward held as security for his said advances.

On the other side, it is claimed that Hayward constantly held the identical stock certificates which he took as such security from the time when he received them up to the time when he admits that he sold them, or that if he did not, during all of such time, have said identical stock certificates in his possession, that he did, during all of such time, have other stock certificates of the same mining company for the same number of shares, which, during all of such time, he was able, ready, and willing to deliver to Rogers, upon his paying the sum for which said certificates were held as security.

It is to the admission and rejection of evidence, and to the giving and refusing of instructions upon this issue, that most of the exceptions are directed.

The transaction out of which this litigation arose, as narrated by Rogers in his testimony, was as follows:

"I went to Mr. Hayward, and found him alone in his front
CAL. REPS. LXII—24

office. I said to Mr. Hayward that I had two hundred and ten shares of Savage coming in on Monday; that is, it was due Monday—we speak of it as coming in, and I was afraid I would not be able to take care of it, and would sell the stock. * * * I told him that I thought that perhaps, rather than to see that amount of stock thrown on the market, he might assist me in taking care of it. He asked me at what prices the stock was coming in. I told him; and he said: 'Send it to me.' That is, the two hundred and seventy shares. * * * Then, upon his saying, 'Send it to me,' he says: 'By the way, what has become of that two hundred shares Burling was carrying for you?' I says: 'Burling is still carrying it.' He says: 'Order that up and send it to me.' I told him I would do so. That was the end of the conversation. There may have been something said about interest—probably was.

"Q.—Was anything said as to Mr. Hayward's power or authority to sell it? A.—Not a word.

"Q.—What was done in consequence of that arrangement, if anything? A.—The stock was delivered to Mr. Hayward and he paid the money that was spoken of, about $186,000, that he advanced to these different parties for this stock."

In considering the exceptions upon which the appellant relies, we shall assume, as indeed we must, that this is the correct version of that transaction. And in view of that, and the further fact that it is not charged in the cross-complaint of Rogers that he was induced to do what he did by reason of any representations of Hayward as to the condition of the mine, or the then present or prospective value of the stock, or in regard to the quantity of it which Woods & Freeborn, or any other person or persons, were selling, we do not think that the Court erred in sustaining the objections of respondent to the introduction of evidence of what Hayward said to Rogers in regard to those subjects.

Nor do we think that the Court erred in allowing the witness Peart to be asked how much stock Hayward carried for Rogers from April 22, 1872, to November, 1872. According to the testimony of a majority of the witnesses, Peart was better qualified to answer that question than any other witness, including Hayward himself. When this question was

asked, appellant's counsel said: "I understand that question to be an offer to contradict their own witness, to contradict Mr. Hayward's books and Mr. Peart himself. I object to it as incompetent." Appellant's counsel seem to have assumed that the answer of the witness would contradict all the evidence to which the objection referred. But we are unable to see how the Court could have anticipated the answer of the witness, and if it could not, there was no error in overruling the objection. After the witness had answered the question, no motion was made to strike the answer out, and the Court, therefore, had no opportunity, after being sufficiently advised, to decide whether or not the witness had contradicted the evidence referred to. And according to our understanding of the evidence, there is no such contradiction.

The evidence as to the number of shares of stock that Hayward was carrying for persons other than Rogers, and as to the contents of the letter which Rogers wrote to Hayward, may not have been relevant to any issue in the case, but as we can not conceive how the appellant could possibly be prejudiced by it, the error, if error there was in overruling the objections to it, must be disregarded.

Upon the main issue in the case the Court charge the jury as follows: "If you find that Hayward had sold the 690 shares before the execution of the power; that you remember was July 13th; and had been ready, able, and willing to transfer to Rogers an equivalent number of similar shares in the same company by a proper and valid certificate, then and in that case it was not material that these facts should be imparted to Rogers at the time he executed the power of attorney, and the power was a valid and binding one. It was not material to tell him that, for the reason that that was a thing that Hayward had a right to do anyway, and the law says, that he was selling his own stock, and not Rogers' stock, provided he was all the time able, ready, and willing to respond to Rogers, in case he should come and demand his stock. And if you find that Hayward had sold the identical 690 shares, and that he was not at the time of such sales able, willing, and ready to deliver to Rogers a similar number of shares, then, and in that case, the suppression of those facts operated as a fraud upon Rogers, and destroyed the force and

effect of the power of attorney, there being nothing for the power to operate upon." This, in our opinion, was a correct and sufficiently clear exposition of the law applicable to that issue, and it obviated the necessity of the Court's giving any other or further instructions upon it. Therefore the refusal of the Court to give the instructions asked on the points covered by the instruction given, is not a sufficient ground for reversing the judgment.

The charge of the Court as to what would constitute a bar to Rogers' right of action against Hayward, appears to us to be substantially correct. Another portion of the charge to which exception was taken, reads as follows: "When facts are testified to by witnesses who are not impeached, and there is no inherent improbability in the statement, the jury are bound to take that evidence as proving the particular fact; and the jury have no right capriciously to disregard evidence where it is not controverted and the character of the witnesses is good, and the story is probable."

There ought to be no necessity for giving such an instruction to a jury. A juror who required to be so instructed would be utterly unfit for the position. But as a matter of law we think the instruction was correct, and, so far as we can see, it was as favorable to one side as it was to the other.

We do not think that the judgment should be reversed; but it must be modified. The jury found for the plaintiff in the sum of $295,345.38 and the judgment was entered for the sum of $305,050.95.

It is therefore ordered that this cause be remanded to the Court below with directions to so modify the judgment as to make it correspond with the verdict of the jury; and, when so modified, it is hereby affirmed.

MORRISON, C. J., and McKEE and McKINSTRY, JJ., concurred.

ROSS, J., concurring:

The plaintiff was justified in acting in accordance with the views expressed by this Court in the case of *Atkins* v. *Gamble,* 42 Cal. 86. It matters not whether those views accord with our own notion as to what the law ought to be. That

case was the law when the transactions in question occurred, and has remained so ever since. Whatever certificates of stock the plaintiff sold, of those received by him on account of the defendant, were replaced by him with like certificates prior to the execution of the power of attorney from defendant to plaintiff. At the time the power of attorney was drawn the defendant was present with the plaintiff's agent, the certificates of stock were produced, and from them the attorney obtained the number of the certificates and the number of shares, and drew a power of attorney, which the defendant executed, authorizing the plaintiff to sell them; and this he did.