[Civ. No. 5811. Second Appellate District, Division One.—April 24, 1928.]

LOUIS HENNING, Appellant, v. CHARLES C. AKIN et al., Respondents.

James L. Allen and James L. Davis for Appellant.

Randall & Bartlett for Respondents.

HAHN, J., *pro tem.*—It is alleged in the complaint in this action that on or about the twenty-fifth day of June, 1923, plaintiff borrowed from the defendants the sum of $4,000, evidencing this loan with his promissory note for said sum, payable in 30 days, with interest at the rate of one per cent per month; that as security for the payment of said sum plaintiff indorsed and delivered to the defendants a certifi-

cate for 78.6 units of the White Star Oil Syndicate, the reasonable market value of which at that time was about $15,000. It is further alleged that on or about the twenty-seventh day of July, 1923, plaintiff arranged with defendants for a renewal of said loan for a period of 90 days, and executed a new note for the principal sum of $4,000, wherein interest was made payable at the rate of one per cent per month; that as security for said new note the defendants retained the hereinabove referred to certificate for 78.6 units of the White Star Oil Syndicate.

The complaint then alleges, upon information and belief, that prior to the maturity of the said renewal note, the defendants sold the said White Star Oil Syndicate units for a sum considerably in excess of $4,000, the exact amount unknown to the plaintiff; that the defendants have not paid over to the plaintiff the excess received by them for the sale of said units over and above the indebtedness owing by plaintiff to the defendants, but that said defendants are still demanding of plaintiff the payment of the amount of said note. The prayer of the complaint is that defendants be required to make an accounting of the proceeds derived by them from the sale of said units, and that plaintiff have judgment for the excess amount received by the defendants from said sale over the indebtedness due on account of said promissory note, and for general relief.

The defendants in their answer admit the execution of the note and the receipt by them of the units of the White Star Oil Syndicate, but deny that the units were received by them only as collateral security, alleging in addition that they were to have the right to use and handle said units as provided in the note executed by plaintiff at the time that the loan was made. The answer further denied that the said units so delivered by plaintiff to the defendants, or any of them, were sold. It should be noted that there is no provision in the pledge agreement authorizing the defendants to sell the units except in the event of default on the part of the maker of the note.

Defendants in addition filed a cross-complaint alleging the execution of the note and the delivery by plaintiff to the defendants of the units of the White Star Oil Syndicate, but allege that the renewal note was for the principal sum of $4,120. The defendants further allege that the said note

became due, and that after maturity they tendered to the plaintiff "78.6 units of the White Star Oil Syndicate No. 1," and demanded payment of the note, but that plaintiff failed and refused to pay the note or any part thereof; that defendants tendered into court 78.6 units of the White Star Oil Syndicate to be delivered to plaintiff upon payment of the sum due on the note. The prayer in the cross-complaint is for judgment for the full sum of $4,120, as principal, with interest thereon at the rate of one per cent per month from July 27, 1923, and for attorneys' fees and costs.

The plaintiff, answering defendants' cross-complaint, denies that he has not paid the principal and interest of said promissory note, and denies further that there is any part thereof remaining unpaid or due. He admits that he refused to accept the tender of the units of the White Star Oil Syndicate, for the reason that they were not the same units which had been delivered by the plaintiff to the defendants. It is also alleged, in answer to the cross-complaint, that the note is usurious.

The note set up in the answer and cross-complaint is in the usual form exacted by brokers where clients purchase stock on margin. Among other things therein contained is the following provision: "It is further agreed that the above named security or any part thereof may be loaned by the Akin-Lambert Co. or may be pledged by it either separately or together with other securities, either for the sum loaned thereon, or for a lesser or greater sum, or may be used by it in making deliveries or making substitutions in its business, all without further notice to the undersigned; . . . The Akin-Lambert Co. shall not be obliged, however, to return to the maker the specific collateral deposited, but may deliver in place thereof a like amount of the same securities." Provision is made in the note for the sale of the units only in the event the maker is in default.

There seems to be no controversy over the fact, as testified to by plaintiff, that he actually received only $4,000 as a loan for which he executed the note for $4,120. When the note became due, defendants demanded payment, but plaintiff contended that the note had been paid by reason of the unauthorized sale by defendants of his oil units, the proceeds from which were retained by the defendants.

It also appears that at some time between the date of delivery of the units by the plaintiff to the defendants and the date of the trial, defendants received as dividends declared upon the 78.6 units the sum of $1,222.58, which amount was credited upon the note.

When during the trial plaintiff undertook to elicit testimony in support of his allegation that the defendants had without authority sold his collateral units, defendants objected to this line of evidence, contending that it was wholly immaterial, for the reason that they were tendering into court the same number of units which they had received from the plaintiff as collateral. This objection was sustained by the court, and the plaintiff was refused an opportunity to offer any testimony on this issue.

Judgment was rendered against the plaintiff on his complaint and in favor of the defendants on their cross-complaint for the sum of $2,897.42, being the amount which the court found due and unpaid on account of the principal and interest of the note. The credit allowed was due to dividends paid to defendants on the units while held by them.

Two points are raised by appellant in seeking a reversal of the judgment.

First: That the court erred in sustaining the defendants' objections to plaintiff's offer of testimony to prove that the defendants had, prior to the maturity of the note and contrary to its provisions, sold the 78.6 units of the White Star Oil Syndicate, which the plaintiff had delivered to the defendant as collateral security for said note.

Second: That the contract being usurious, the court erred in including in its judgment the $120 which was added to the $4,000 actually loaned to constitute the principal of the note, and interest thereon at the rate of one per cent per month.

The first point involves the question as to whether or not the holder of a promissory note with units or shares of a commercial enterprise pledged as collateral security, may, contrary to the terms of the pledge agreement, sell the units without the owner's consent and avoid the owner's subsequent demand for an accounting of the proceeds derived from such sale, by tendering to the owner other units of similar character. In considering this question we will regard

the units herein involved as similar in character to the shares of stock of a corporation.

Although the answer denies that the units which were delivered by appellant as collateral security were sold, in the trial of the case, the defendants did not rest their case upon this allegation, but relied upon the proposition that the defendants had a right to sell the collateral, so long as they tendered back, when the note became due, the same number of units of the White Star Oil Syndicate as were originally pledged with them. This position respondents endeavor to maintain largely upon the authority of the case of *Atkins* v. *Gamble,* 42 Cal. 86 [10 Am. Rep. 282], and upon subsequent cases approving the rule as therein laid down.

It is well established as a general proposition that a pledgee must return upon the payment of the debt the identical property pledged as collateral security. (*Hudgens* v. *Chamberlain,* 161 Cal. 710, 715 [120 Pac. 422]; *Atkins* v. *Gamble,* 42 Cal. 86 [10 Am. Rep. 282].) There is, however, an exception to this general rule where shares of stock of a corporation have been pledged as collateral and certain conditions exist; and, also, in cases where certain commodities are delivered in pledge, such as wheat, which in the handling becomes so mixed with other commodities of similar character that it may become impossible to return the identical commodity which was originally pledged. The case of *Atkins* v. *Gamble* is the earliest decision in this state noting the exception, and contains a rather extended discussion of the considerations involved in justifying the establishing and recognition of this exception to the general rule. We deem it important to have clearly in mind the facts in that case and the important considerations which form the basis for the court's conclusion.

Atkins, the plaintiff, was a stockholder in a mining company of which Gamble, the defendant, was the president and a large stock owner. Atkins borrowed some money from Gamble, and as collateral security for the payment of this obligation pledged with Gamble six certificates for a total of 33⅓ shares of the stock of the mining company in question. Gamble desired to sell ten shares of his own stock to one Martin and contracted to do so. Fearing that publicity of the fact that the president of the company was selling some of his stock might be injurious to the company's interests,

he conceived the idea of avoiding this undesirable consequence by using one of Atkins' certificates of stock which he held as collateral for the purpose of making delivery to Martin. Subsequently plaintiff paid in full his indebtedness to the defendant, whereupon the defendant tendered back to him certificates for the full number of shares which were pledged, 10 shares of which were substituted out of defendant's own stock to take the place of the 10 shares transferred to Martin. When Atkins discovered that Gamble had used one of his certificates of stock in consummating the sale at a price considerably in excess of the market price of the stock at the time Gamble returned the collateral to him, Atkins brought suit to recover the amount which Gamble had received for the sale of the stock, on the theory that there had been a conversion by Gamble of the Atkins' stock.

The court, in considering this situation, and announcing, so far as California was concerned for the first time, an exception to the general rule, said: "Whilst stock in corporations is denominated personal property, and is subject to seizure and sale under execution, and whilst a particular certificate may be capable of complete identification, by its numbers or otherwise, the certificate is but the evidence that the holder of it is entitled to an undivided share in the assets and business of the corporation. The stockholders are the joint owners of the franchise and property of the corporation, each being entitled to an undivided share thereof, and the only office of the certificate is to furnish the evidence of the *quantum* of interest held by the owner of the certificate."

After discussing and considering a number of cases wherein a similar question was under consideration, the court says: "We hold, therefore, both upon reason and authority, that by the delivery to Martin of ten shares of the plaintiff's stock, the defendant, *on the facts proved and found* (italics ours), did not become responsible to the plaintiff for the proceeds of the sale. . . . *The defendant was at all times able, and ready, and willing to transfer to the plaintiff the same number of shares of similar stock of the same company*, and which had precisely the same value." (Italics ours.)

It will be noted that the court, in declaring its conclusions, deemed it important to preface it with the statement "on the facts proved and found." These facts as stated clearly show:

First: That defendant at the time he used plaintiff's certificate for 10 shares and at all times thereafter was the owner and in control of more than 10 shares of stock of the mining company in question.

Second: That he intended to and did sell 10 shares of his own stock.

Third: That in delivering one of plaintiff's certificates for 10 shares to Martin, he made use of this evidence of ownership of 10 shares as a mere convenience.

Fourth: That at all times he was ready and able to deliver to plaintiff a certificate evidencing the ownership of 10 shares of the same stock.

Following the *Atkins* v. *Gamble* decision our supreme court next had occasion to express itself on this subject in *Thompson* v. *Toland,* 48 Cal. 99. The court, in citing with approval the rule as laid down in *Atkins* v. *Gamble,* emphasizes as a necessary condition for the application of the rule that the pledgee be at all times ready and able to return upon demand shares of stock equal in number to those of the pledged stock used by him.

In the case of *Hayward* v. *Rogers,* 62 Cal. 348, it appears that the defendant had borrowed considerable sums of money from the plaintiff, and as security for the payment of these sums had pledged certain certificates of stock. Prior to the maturity of the obligation Hayward made several sales of stock of the corporation, certificates for shares of which he held as collateral to Rogers' note. In completing these sales Hayward used several of Rogers' certificates of stock. Subsequently the debt not being paid when due Hayward brought action upon the notes, and Rogers set up in his defense the fact that Hayward had sold part of his pledged stock, and demanded that the proceeds derived from said sale be credited upon his indebtedness to Hayward. It appears that at the time Hayward sold the stock, the market value was greatly in excess of the market value when the suit was brought. In relation to the question as to whether or not Hayward was liable to Rogers for the proceeds of the sale, the court instructed the jury that if Hayward, at the time that he used the certificates of stock belonging to Rogers, was actually intending to sell his own interest in the corporation and had merely used Rogers' certificates for the pur-

pose of conveying the same to the purchaser, and was at that time and at all times ready, able, and willing to deliver to Rogers an equal number of shares of stock, then Rogers was not injured by Hayward's act in using the pledged certificates, and the court instructed the jury further that "if they found that Hayward had sold the identical 690 shares, and that he was not at the time of such sale able, willing, and ready to deliver to Rogers a similar number of shares," then Hayward would not be relieved from the obligation to make an accounting of the proceeds to Rogers. It is interesting to note that the court, in instructing the jury, in order to emphasize and make clear the line of demarcation between a pledgee's conduct with the pledged property that would require him to return the identical property pledged, and a situation where he could return other similar property, points out the case where a warehouseman takes wheat as a pledge security and commingles it with other wheat, owned and controlled by the warehouseman, of the same character. In such cases the court pointed out that the warehouseman is required to return, upon the payment of the debt, not the identical wheat he received in pledge, but he fulfills his obligation when he returns the same amount of wheat of similar quality. Upon appeal, our supreme court held these instructions correctly stated the rule applicable where pledged certificates of stock were used without authority by the pledgee.

In a later case, that of *Bell* v. *Bank of California,* 153 Cal. 234 [94 Pac. 889], the same considerations were pointed out in the following language: "It is true that, in the case of a pledge of shares of stock in a corporation, the identity of the particular certificates delivered and pledged is not important. (*Atkins* v. *Gamble,* 42 Cal. 86 [10 Am. Rep. 282].) A sale of these certificates will not constitute a conversion, if the pledgee has at all times had in his possession, ready for delivery to the pledgor upon redemption, similar certificates evidencing a right to the same number of shares. (*Thompson* v. *Toland,* 48 Cal. 99; *Hayward* v. *Rogers,* 62 Cal. 348.) . . . But there is no presumption that the pledgee has such certificates," etc.

We have pointed out with some detail and at length the views of the court as expressed in the foregoing cases, for the purpose of making clear the line of demarcation, and

more particularly to note that in all of these cases the courts have recognized the right of a pledgee of certificates of stock to use them only when he is in fact the owner of stock himself in the corporation and is attempting to make a sale of his own stock, using the pledgee's certificates merely as a convenience in consummating his own transaction. We have nowhere found this rule made applicable to a situation where the pledgee of corporate stock, not being the owner himself of shares of stock in the same corporation, makes a sale of such pledged stock and subsequently upon the maturity of the debt repurchases a similar number of shares of stock for the purpose of returning them to the pledgor. To apply the rule to such a state of facts would be to undermine the well-established principles and considerations that are recognized as necessarily controlling the use by a trustee of the trust estate committed to him.

█ It is well established that the relation existing between a pledgor and a pledgee of the personal property is in the nature of a trust relation. The responsibility of the pledgee is that of the trustee. He will be held strictly to account for his conduct in relation to the trust property. (*Hudgens* v. *Chamberlain,* 161 Cal. 710 [120 Pac. 422].)

█ In the instant case the complaint directly charges the misuse by the pledgee of plaintiff's pledged stock by making a sale of it without plaintiff's knowledge or authority. The answer directly denies this charge. It thus became a material issue in the case. If plaintiff is able to support his allegation, the burden would then fall upon the defendants to show that they came within the exception rule, i. e., that when they improperly used plaintiff's certificates they were then and at all times thereafter ready, willing and able to deliver to plaintiff on the payment of the obligation an equal number of units of the White Star Oil Syndicate. If the evidence would then disclose that at the time that the sale was made defendants had no units of their own, but subsequently purchased units for the sole purpose of making return to the plaintiff, defendants clearly would not come within the rule that entitled them to be relieved from making an accounting to the plaintiff, for under such circumstances it would appear that the defendants sold plaintiff's units, and immediately upon such sale plaintiff had a cause of action against the defendants to compel an accounting.

It would then be well within the province of a court of equity to require the defendants, upon crediting the full amount remaining unpaid on the plaintiff's indebtedness to them, to pay over the excess proceeds to the plaintiff.

Another pertinent question arises in the instant case from the fact that dividends were declared by the syndicate upon the various units. It appears that plaintiff himself received some of these dividends, and the defendants also received dividends. Defendants testified that they had credited upon plaintiff's note all the dividends they received, but it nowhere appears in the record that the dividends which the defendants did receive and those which the plaintiff received constituted all of the dividends that were declared upon the units of the syndicate between the time that plaintiff pledged his units with the defendants and the date of the trial. If, forsooth, several weeks or months elapsed between the time of sale and transfer of the pledged units by the defendants, and the time when they repurchased units to return to the plaintiff, dividends had been declared by the syndicate, none of such dividends would have been paid to the defendants, for the reason that during such interim the dividends would have been paid to the actual owner or holder of the 78.6 units which had been sold.

Respondents urge that even if there is merit in appellant's contention that under his offer of proof evidence might have been adduced that would entitle him to recover by reason of the unauthorized sale, he may not do so in this case, for the reason that his remedy under such circumstances would be in an action for conversion; that the instant action is one for an accounting and not for conversion. We can see no merit in this contention. Plaintiff clearly had a right of action to recover from the defendants, if he could show that defendants had unlawfully used his property, and that he had been damaged thereby. Whether we call the action one in conversion or one in *assumpsit*, is of little consequence. The prayer for an accounting is a mere incident to the main purpose of the action, namely, the recovery of money. The effect of the action is that plaintiff ratifies the sale made by defendants of his stock and demands that the proceeds be applied on his indebtedness. He was well within his rights in filing the instant action. (*Bell* v. *Bank of California,* 153 Cal. 243 [94 Pac. 889].)

■ The second point raised by appellant that the note in question is usurious and that therefore the court erred in rendering a judgment that included the interest and the bonus or commission included in the principal of the note, must be sustained.

Respondents in their brief virtually concede appellant's contention. It is not denied that appellant received but $4,000, for which he executed a note for $4,120. The only conclusion that can be drawn from the evidence is that the $120 was in the nature of a bonus or commission to respondents. The note in addition provides for one per cent per month interest. This clearly stamps the document as a usurious note. (*Wallace* v. *Zinman,* 200 Cal. 585 [254 Pac. 948]; *Haines* v. *Commercial Mortgage Co.,* 200 Cal. 609 [254 Pac. 956, 255 Pac. 805]; *Blodgett* **v.** *Rheinschild,* 56 Cal. App. 728 [206 Pac. 674].)

Judgment is reversed.

Conrey, P. J., and York, J., concurred.