[S. F. No. 14398. In Bank.—January 28, 1932.]

B. F. EDWARDS, Appellant, v. REGINALD C. JENKINS et al., Respondents.

S. Laz Lansburgh and S. Joseph Theisen for Appellant.

Sloss & Ackerman and Ackerman, Wayland & Mathews for Respondents.

SEAWELL, J.—On March 14, 1927, plaintiff directed the defendant Logan & Bryan, a copartnership engaged in the stock brokerage business in the city and county of San Francisco and elsewhere, and a member of the San Francisco Stock and Bond Exchange and the New York Stock Exchange and other exchanges in the United States, with its principal office in the city of New York, to purchase for him 500 shares of the preferred stock of the Julian Petroleum Corporation, at a price not to exceed $12 per share, with the instruction to said brokers, so he testified, to keep it subject

to his order, as he was purchasing it as a matter of speculation and that he would make a quick sale of it. On March 15th said stock-brokers purchased 500 shares of said Julian Petroleum Corporation preferred stock as per order of plaintiff at the price of $12 per share, and plaintiff thereupon paid said brokers the purchase price thereof, to wit, $6,000, plus their brokerage commission of $112.50. Mr. C. E. Carson, who was in charge of the cashier's department of the brokers, testified that upon receipt of said $6,112.50, on March 15th, said brokers, Logan & Bryan, through their representatives, Anderson & Fox, brokers, purchased and actually took into their possession in the execution of Mr. Edwards' order, 500 shares of said Julian Petroleum preferred stock, standing in the names of the following persons: One certificate for 100 shares standing in the name of B. Sanders; 100 shares standing in the name of A. C. Hatch; 100 shares standing in the name of L. M. Lewis; 100 shares standing in the name of R. R. Kingsley; 100 shares standing in the name of W. Morgan. On April 21, 1927, without the order or knowledge of Mr. Edwards, the certificate for 100 shares standing in the name of said B. Sanders was delivered by Logan & Bryan to one Newell Murdock in the consummation of a transaction in which Edwards had no interest. The other certificates representing the balance of said shares of stock were, according to Mr. Carson in accounting for the same, without the order or knowledge of plaintiff, sent on March 21st and 24th to the home office of the Julian Petroleum Corporation at Los Angeles for transfer purposes. Julian stock had been sharply declining in selling price since the latter part of April and continued to decline through the month of May until May 9th, when it dropped to "*nil*".

On May 4th Logan & Bryan sent out the following notices, one of which was directed to and received by Mr. Edwards:

"Dear Sir: In checking over our records it is noted that we are carrying long in your account five hundred (500) shares of Julian Preferred. As we do not care to execute any further orders in this stock, will you please, at your earliest convenience, give us instructions to deliver your holdings.

"Thanking you for your prompt attention to this matter, we are,

"Yours very truly,
"Logan & Bryan."

At about the hour of 11 o'clock A. M. on the following morning, to wit, May 5th, Mr. Edwards presented himself at the office of Logan & Bryan and requested the delivery of his stock. Two versions are given of two conversations which took place at the cashier's window, one occurring on the morning Mr. Edwards demanded the delivery of his stock and the other on the second day thereafter, in which Mr. Caprilli, an assistant cashier of Logan & Bryan, and Mr. Edwards were the principals. Mr. Caprilli was in New York at the time of the trial, and no testimony was given by him in person or in the form of a deposition. Mr. Carson, who had no direct conversation with Mr. Edwards in the matter, testified to important statements which he claims to have overheard in the two conversations which occurred between said principals. There is a conflict in some important particulars and in other respects there is no material disagreement. But accepting Mr. Carson's narration of said conversation had between Mr. Caprilli and Mr. Edwards, rather than the narration of Mr. Edwards, and giving to it its fullest evidentiary value, it is not sufficient to support the findings. According to Mr. Carson's testimony, the number of shares of Julian stock on deposit with Logan & Bryan on the day said notices were sent out was 3,755. Immediately following the sending out of said notices the number of shareholders who called at once for their stock was very great. The number of shares that remained in the possession of said brokers at the hour plaintiff called for his stock on May 5th does not satisfactorily appear. This being an important matter of book accounting, it should not rest in a state of confusion, conjecture or uncertainty. The burden of excusing failure of delivery of said stock to its owner upon demand was upon the brokers, whose duty it was to hold it subject to plaintiff's call.

Mr. Carson, in undertaking to justify the failure of Logan & Bryan to deliver to plaintiff his stock, upon direct examination testified as follows:

"Q. Did you hear a conversation take place between Mr. Caprilli and Mr. Edwards? A. I did. Q. Will you please

state as well as you can recall what was said by either party to the conversation? A. Mr. Edwards presented this letter which we had sent out on the 4th, and said that he was calling in response to that letter, and would like to have delivery of his stock. Q. What was further done or said in response to Mr. Edwards' question? A. He told him that he would see if he could make up the delivery for him of 500. Q. Then what did Mr. Caprilli do? A. He checked the security box. Q. What was the result of the checking of the box? A. He found he could not make a strip of 500 shares. Q. You said you had 505 shares in possession at that time. Explain to the court why you were unable to make change on 500 shares. [The witness had previously shown by figures that there were only 80 shares in the box, but later changed the number of 505.] The Court: I take it the size of the certificates. A. The size of the certificates did not allow us to make them, and take off a record of such certificates as we had retained, and decided that we could not. Q. Did you give Mr. Caprilli any instructions as to what to do or say to Mr. Edwards? A. Yes, sir. Q. What did Mr. Caprilli do or say after you had had a conversation with him, and after he had checked the box? A. He called up the manager of the local clearing house, Mr. Sorrick . . . and he asked Mr. Sorrick whether he would be able to get a large bunch of stock which we had in transfer. Mr. Sorrick told him he was expecting it any day, it might possibly be in tomorrow; they had been expecting it daily and had been disappointed; it had taken longer than usual. On the 6th again we were unable to get any stock. Q. What did Mr. Caprilli do then? Did he go over to speak to Mr. Edwards again? A. He did. Q. Please state what he did say? A. He advised Mr. Edwards that we were unable to make delivery from stock which we had on hand, and that we expected stock in any day, in a day or so, from the clearing house; that we had been assured by them that it would be back from transfer.''

On May 7th, when Mr. Edwards again called for his stock, Mr. Carson gave the following account of what occurred:

''Mr. Caprilli advised him again that the stock was not back from transfer yet, and expressed our regrets, and told him that we had been told by the clearing house that the

stock would be in Monday. And Mr. Edwards said that he had been annoyed; that we had asked him to take up his stock and that when he had called for his stock we were not able to deliver it. And we told him that we had given him a reason for this, and that he could have his stock by Monday, we were quite sure. At that time we were not aware of the fact that they were holding up the stock on the company's books, and Mr. Edwards went away.''

The witness stated that the 505 shares of stock mentioned aforesaid were still on hand. At no time, however, was plaintiff informed that said brokers had on hand 505 shares of stock, or any number of shares. The only fair inference that could be drawn from respondents' conduct was that they did not have any stock on hand. Nothing was said to plaintiff about the denominations being such that they could not make even change. Mr. Edwards, if given an opportunity, may have gladly waived a few shares in the face of an impending crisis in order to obtain possession of a considerable portion of his stock. The five shares in excess of his 500 shares were certainly of trifling value when called for, to wit, May 5th, $18.75; May 6th, $15; May 7th, practically no value. Plaintiff testified that when he purchased said stock he bought it on speculation, and instructed them to hold it as he would sell on quick notice. On May 5th he called at the office with the letter which had been mailed to him, and after inquiring ''what was the matter with Julian'', said, ''this does not sound very good'', and handed the letter to an employee at the window. This party finally said to him, ''Mr. Edwards, this stock has not yet come in from the clearing house.'' Mr. Edwards replied, ''You probably are mistaken. This is a transaction of about a month or six weeks ago, and certainly it has come in from the clearing house,'' and he replied, ''No, it has not come in from the clearing house, but we can get it this afternoon,'' and upon being told it would not be possible for Mr. Edwards to call in the afternoon, the man at the window proposed that he send it to Mr. Edwards' office, at 240 Montgomery Street. Mr. Edwards replied, ''Why not now?'' The employee repeated the clearing house matter and promised to send the stock to him. He said, ''I will send it or mail it to you.'' It was not sent and two days later he called again and no

stock had arrived. The clearing house statement was repeated. Mr. Edwards insisted on something more definite and he was told, after a conference with two or three of respondents' employees, that they had sent the stock to Los Angeles to be placed in Mr. Edwards' name. He asked why this had been done, and the reply came that it was customary to have stock placed in the owner's name. Mr. Edwards said he was not posted in such matters, but said he certainly did not instruct said brokers to put the stock in his name. Plaintiff witness said he was very anxious about the stock, as the air was full of rumors of overissues, as Logan & Bryan would neither sell it nor deal in it and he was unable to sell it unless he could deliver it. He was told they would have the stock for him on Monday, May 9th. On May 6th trading in Julian stock was suspended, and on May 9th the federal court issued an order restraining further transfers of Julian stock. Plaintiff refused to accept delivery of said stock after it had become valueless, as herein related, and commenced this proceeding in conversion.

Viewed from the testimony of either of two important witnesses, Mr. Carson or Mr. Edwards, said brokers were liable both in conversion and for a breach of their contract. Either they had similar shares on hand and refused to deliver, or they had given up possession and were unable to deliver. In either case, there would be a conversion. It does not seem reasonable that respondents would have refused delivery, having notified plaintiff to call for his stock, had they not exhausted their supply in making deliveries to other customers. They were not requested and there was no obligation upon them to send the stock to Los Angeles out of their possession for any purpose.

*Henning* v. *Akin,* 91 Cal. App. 246 [266 Pac. 981], is not an authority here in the light of the facts of the instant case. In most, if not all, cases relied upon by respondents the relation of pledgor and pledgee, or bailor and bailee existed. In that line of cases it has been held that if an equivalent amount of shares remain in the hands of the broker, or under his control, the requirements of the contract are met. In such cases shares of stock will be treated as interchangeable in the hands of the broker and an action in conversion will not lie. In the instant case plaintiff had paid in full for his

stock, plus respondents' commission of $112.50, and respondents had neither a pledgees' lien nor bailees' claim against it. It was plaintiff's property in the custody of respondents.

There is no doubt as to the rule of law which governs the instant case, keeping in mind the fact that the stock had been paid for in full and no question of a sale on margin or pledging of the stock is in the case. A broker, having executed his customer's order for the purchase of securities, must deliver the securities to the customer on receipt of his advances for the price and his commissions whenever he shall call for them. The customer is entitled to have his securities maintained in a situation where they are available for delivery to him on tender and demand. They will not be considered either in his possession or under his control if they are in a distant city where they are not available for delivery to his customer on demand. (Meyer on The Law of Stock Brokers and Stock Exchanges, p. 327; 9 Cor. Jur., pp. 543, 544, 545.)

That respondents upon two separate demands were either unable to deliver or refused to deliver plaintiff his stock, and that said unwarranted withholding was the proximate cause which deprived plaintiff of an opportunity to sell at the market price at a critical time, is conclusively shown by the case made by respondent brokers.

The District Court of Appeal, First District, Division Two, followed the trial court in holding for respondents on the ground that conversion requires an actual wrongful intent, and that there was no such intent shown in the instant case. Conversion does not require proof of wrongful intent. This question must be considered with respect to the rights of the purchaser of stock and the duty which the broker owes to the buyer. The latter is entitled to have his securities maintained in a situation where they are available for delivery to him on tender and demand. Unless he retains the equivalent, the broker is not permitted to sell a customer's stock or to use it for his *own purposes* except as authorized by the customer or permitted by law. (Meyer on The Law of Stock Brokers and Stock Exchanges, pp. 324, 325.) The breach of an absolute duty may, in certain relationships, constitute a tort. *Swim* v. *Wilson*, 90 Cal. 126 [25 Am. St. Rep. 110, 13 L. R. A. 605, 27 Pac. 33], *Bancroft*

*Whitney Co.* v. *McHugh,* 166 Cal. 140 [134 Pac. 1157], and *Poggi* v. *Scott,* 167 Cal. 372 [51 L. R. A. (N. S.) 925, 139 Pac. 815, 816], have definitely established the law which must rule this case. We quote from *Poggi* v. *Scott, supra:*

"The foundation for the action of conversion rests neither in the knowledge nor the intent of the defendant. It rests upon the unwarranted interference by defendant with the dominion over the property of the plaintiff from which injury to the latter results. Therefore, neither good nor bad faith, neither care nor negligence, neither knowledge nor ignorance, are of the gist of the action. 'The plaintiff's right of redress no longer depends upon his showing, in any way, that the defendant did the act in question from wrongful motives, or generally speaking, even intentionally; and hence the want of such motives, or of intention, is no defense. Nor, indeed, is negligence any necessary part of the case. Here, then, is a class of cases in which the tort consists in the breach of what may be called an absolute duty; the act itself (in some cases it must have caused damage) is unlawful and redressible as a tort.' "

Stocks are subject to great and sudden fluctuations in market value and the obligation of a broker to be able to make a ready delivery to a customer entitled to the same upon demand is obvious. If he voluntarily places himself in a position whereby his customer suffers a loss by reason of his inability to perform, he, and not the customer, must bear the loss. ██ The test of a broker's liability, universally adopted by the law, is, was the broker able, willing and ready to make delivery of the stocks which he held as the owner's custodian? The answer of the broker is that it was not. The amount of damage would be in this case the same, to wit, $1875, whether awarded upon the theory of conversion or breach of contract or duty, said sum being the market value on May 5th, the day said brokers defaulted in delivery. No attempt was made to show any damage additional to that suffered by the shrinkage of the stock in value.

From a consideration of the material and controlling facts of this case it appears that upon no reasonable theory could the respondent brokers, upon a retrial of the cause, present a substantial defense wholly absolving them from liability for damages for the conversion of said stock. This court

therefore finds upon the record herein (see *Tupman* v. *Haberkern*, 208 Cal. 256, 269 and 270 [280 Pac. 970]), that on the fifth day of May, 1927, the defendant brokers, R. C. Jenkins and Logan & Bryan, a copartnership, converted to their own use said 500 shares of the preferred capital stock of the Julian Petroleum Corporation, property of plaintiff, the same being on said day of conversion of the stipulated market value of $3.75 per share, or a total value of $1875. The judgment is reversed and the cause is remanded to the trial court with direction to make and enter a judgment in favor of the plaintiff and against said defendant brokers in the sum of $1875, together with interest at the rate of seven per cent per annum beginning May 5, 1927, and with costs.

Shenk, J., Waste, C. J., Curtis, J., Langdon, J., and Preston, J., concurred.

Rehearing denied.