[Civ. No. 22226.   Second Dist., Div. One.   June 18, 1957.]

MYRTLE KESSINGER, Appellant, v. ORGANIC FERTI-LIZERS, INC. (a Corporation) et al., Respondents.

LESLIE E. JOHNSON et al., Respondents, v. MYRTLE KESSINGER, Appellant.

*Assigned by Chairman of Judicial Council.

742

Anderson & Howard and John W. Howard for Appellant.

Paul Barksdale d'Orr for Respondents.

FOURT, J.—This is an appeal by Myrtle Kessinger from a judgment in two actions, in one of which she was the plaintiff and in the other of which she was a defendant, which actions were consolidated for trial.

The suit in which Myrtle Kessinger was the plaintiff and Organic Fertilizers, Inc., Leslie E. Johnson and Neil Andrews were the defendants, was filed in the Pasadena Branch of the Superior Court of Los Angeles County on August 12, 1954. The action in which Organic Fertilizers, Inc., hereinafter referred to as the "Corporation," and Leslie E. Johnson, hereinafter referred to as "Johnson," were the plaintiffs and Myrtle Kessinger and the Bank of America National Trust and Savings Association were the defendants, was filed on August 13, 1954, in the Los Angeles County Superior Court.

A résumé of the facts of the case as developed by the evidence is as follows:

On August 1, 1953, and for several years theretofore, appel-

lant had been the owner of certain property located on 8th Avenue in Arcadia, California, upon which property she had conducted a worm farm business since 1946. A month or so before August 1, 1953, Johnson entered into negotiations with appellant for a lease of the worm farm which occupied the rear portion of appellant's lot on 8th Avenue. Both parties retained the services of the attorneys who represent the appellant in this appeal, and a proposed rough draft of the lease was prepared and submitted to each of the parties. Johnson took his copy, and after some changes and modifications were made and it was rewritten, the lease was submitted by him to appellant on August 1, 1953. On that date the lease was executed as rewritten.

The lease was for a period or term of 10 years and provided, among other things, for a payment of $500 per month as rental to the appellant, the expenditure of monies by the lessee for some permanent improvements on the property and for the accumulation of a fund from the sale of merchandise by the lessee, to be deposited in a bank in Arcadia, with the joint signatures of Johnson and appellant required for the withdrawal of said monies therefrom. All of the accumulations in such fund, above the expenditures for permanent improvements and the payment of certain operating costs, were subject, up to the amount of $12,000 to the following provision:

"In the event that the lessee shall breach this agreement, or shall terminate this lease for any reason other than the act or fault of the lessor, then the entire fund in said joint special account as of the date of said breach or termination prior to the end of the ten-year period shall become the property of the lessor, and shall constitute liquidated damages as between the parties for said breach of the covenants, or for the termination of said lease."

The lease also provided that the lessee was to maintain an inventory of worms in beds at a level not lower than the inventory attached to the lease, and upon termination, to return the worm beds to their original condition, together with all equipment and structures, plus any others erected upon the property during the lease term.

The area leased was in fact but a large lot lying back of appellant's residence, and was reached by a driveway running into the property from 8th Avenue, which bounded the front of appellant's property.

At about the same time the lease was executed, appellant

sold to Johnson approximately 3,500 cubic feet of worm manure in beds and piled on appellant's lot, at the agreed value of $1.00 per cubic foot.

Contiguous to the appellant's property on the north was a lot owned by a Mrs. Null. The two lots were separated by an imaginary line, and the Null lot was accessible to vehicles only by the driveway on the appellant's lot. There was no practical ingress or egress to the Null lot by vehicles except by the driveway on the appellant's property, as indicated.

The corporation was organized and on September 3, 1953, the lease and other properties sold by appellant to Johnson were transferred to the corporation with appellant's written recognition and consent. Johnson was not released from his obligations under the terms of the assignment. The corporation then operated the business of the worm farm, raising and marketing the worms for soil aeration and fish bait, and processing and selling the worm manure under the name "Onagra" as high-grade, organic plant food.

Johnson became the secretary, general manager, and a director of the corporation; appellant became a shareholder and one of its directors, as did Neil Andrews and two other men, Victor Covell and Rex King-Morgan. Appellant was employed by the corporation to superintend the worm culture for eight and one-half months between August 1, 1953, and August 1, 1954, at a rate of from $300 to $350 per month.

On April 16, 1954, the corporation entered into a written lease of the Null property and installed worm beds on it, as the worm beds on the appellant's property had grown prolific, and thereafter the corporation farmed the two lots as a joint operation, crossing back and forth across the line between the two lots and using the driveway on appellant's lot in producing and harvesting the worms and worm manure on both lots.

During approximately the one year of the corporation's operation of the business it paid appellant $500 per month rental, expended about $1,956 in improvements on her property and had accumulated on August 8, 1954, in the "liquidated damages" account in the Bank of America, kept separate from the other corporate funds, the net amount of $4,439.30.

In July of 1954, difficulties apparently arose in the corporation and negotiations were opened between the representatives of the corporation and appellant to the end that there might be a settlement of their troubles. On July 31,

1954, in the evening, there was an informal meeting of some of the directors. Appellant and Johnson were each present and acting as directors, and each participated in the discussions and negotiations. There was a conflict in the testimony as to which directors were actually present at the meeting. There was a dispute as to whether the meeting was regularly noticed and called, or whether it was a consent meeting. There were no formal signed minutes of the session. The secretary did, however, make a memorandum of what took place at the meeting, shortly after the session adjourned, wherein he set forth the substance of the proposals which were to be laid before another meeting of the board of directors, with a contract of settlement and cancellation which might be attached and submitted for its approval. There was much discussion at the meeting of the directors of the settlement terms and conditions. Appellant stated that she "would like to have the Null farm, which is adjoining mine." A proposal was made by the directors to the appellant as to certain divisions of the properties in question, cancellation of the lease and continued use of the premises by the corporation until October 1, 1954. The proposal was not to become effective unless made the subject of a written contract to be attached to the minutes of the board of directors and mutually executed by the parties. The appellant stated to the meeting that she could go no further until she had discussed the matter with her attorney and a written agreement drawn; that "she would not agree to anything until a contract was drawn up and approved by her attorney Mr. Howard." No mention of Johnson, the original lessee, was made in the proposal of July 31, 1954. The attorney for the corporation prepared a draft of a contract on August 1, 1954, which named all of the parties to the lease, and contained the several provisions and agreements set out in the proposal. Andrews, the principal stockholder of the corporation, signed this document. The draft of the contract was submitted to the attorneys for the appellant. The written draft of the proposed contract provided, among other things, that the lease was terminated as of midnight, July 31, 1954. There were no provisions, however, for an escrow nor for the publication of any notice under the Bulk Sales Law and no provisions for a cancellation of the lease which could be recorded to offset the recordation of the original lease. Upon ascertaining the omissions or deficiencies in the draft as submitted, appellant's attorneys prepared additions to it to correct the matters mentioned,

and on August 4, 1954, appellant submitted the written draft with the additions prepared by her attorneys to the corporation which, on August 5, 1954, rejected the counterproposal and advised appellant that her requests were unacceptable and that the lessees would continue on under the lease.

Johnson had been on the worm farm, engaged in the business of the corporation, each working day of August, and was so engaged on August 6, 1954, when appellant served Johnson and the corporation a three-day ''Notice to Pay Rent or Quit'' and surrender the premises. The notice so served also contained the following statement: ''The undersigned as a landlord, hereby declares a forfeiture of the lease and agreement under which you occupy the hereinbelow described property as of the 1st day of August, 1954.'' The notice further recited that the rent due on August 1, 1954, in the sum of $500 had not been paid and was due and owing.

The lease itself contained the following provision:

''11. In the event that Lessee shall breach any of the terms, covenants and conditions herein contained, or in the event the Lessee shall fail to perform the terms, covenants and conditions herein required, and said breach or failure shall constitute cause for forfeiture of this lease, then in that event Lessor shall notify Lessee in writing of said breach or failure by posting notice of breach or failure in the United States mail, addressed to Lessee at 1210 8th Avenue, Arcadia, California, and the Lessee shall then have thirty (30) days after date of said posting in which to comply with the terms, covenants and conditions herein set forth.''

The lessees were never notified of any claimed breach and no notice pursuant to the provisions of the lease was ever served upon them, nor was the corporation in default on August 6, 1954, excepting as to the payment of the rent payable on August 1, 1954.

The lessees elected, under the three-day notice of August 6, 1954, to quit and surrender up the premises to the appellant and on August 7th, started to remove the corporation property from the worm farm, leaving on the appellant's property a list or inventory of what was taken. On August 8, 1954, Johnson, acting for himself as one of the lessees and as an officer of the corporation, appeared at the property with trucks and loaders intending to take off the piled fertilizer, equipment, excess inventory of worms and other personal property of the corporation which was located on the appellant's lot and on the Null lot. Appellant placed a ''No Trespassing''

sign on the entrance to the worm farm, which was removed by Johnson, who began loading. Appellant, after telephoning her attorney and securing his immediate personal appearance and collaboration, thereupon blocked the only ingress-egress to the two lots and drove the lessees and their haulers from the premises and out of the driveway, telling them to remove nothing and threatening to call the officers of the law unless they left immediately. On August 9, 1954, the lessees served upon appellant a notice and demand in writing to the effect that they be permitted and allowed to remove their personal property from the lots, also demanding that she sign a check, which with Johnson's signature would enable the corporation to withdraw its money on deposit at the Bank of America, and held as "liquidated damages." The appellant ignored the lessees' notice and demand and relinquished nothing, neither the money nor the property of the corporation.

On August 12, and 13, 1954, when the complaints were filed, $4,439.30 was on deposit in the joint signature account and $241.90 was later added to the account by appellant.

Appellant, in her action, sought damages for breach of lease, rental, forfeiture of lease and an order transferring to her the funds in the joint account in the Bank of America. The corporation, in its action, sought the value of the properties claimed by it and located on both lots, asserting that the appellant's actions on August 8, 1954, amounted to a conversion of their properties. They also sought to quiet title in the corporation to the fund in the Bank of America.

Both actions were tried as a single case and the cause was submitted, and on February 24, 1956, a memorandum prepared by the clerk, which indicated on its face that it was not a minute order, nor a copy of a minute order, but was a memorandum reflecting the order of the court as of that date, was mailed to counsel for both parties. The memorandum set forth that judgment would be for the corporation and for Johnson and Andrews, and against Myrtle Kessinger, and fixed the damages in certain amounts and provided for the return of the money deposited in the special bank account. It was further set forth that the court found that the corporation and Kessinger had negotiated for a cancellation of the lease, but a final agreement was never reached, and that when Kessinger served her notice to quit, the corporation had the right to quit the premises and remove all of its assets, and the refusal of Kessinger to permit the corporation so to do constituted a conversion. The attorney for the corporation

was directed to prepare the findings and judgment to cover all of the issues in the consolidated trial. Upon receipt of the memorandum from the clerk, the attorney for the corporation called the judge on the telephone regarding the findings to be drawn, and was thereupon invited by the judge to his chambers. In chambers, the judge checked the memorandum sent out by the clerk against his own notes kept at the time of the trial and thereupon instructed counsel on the items to be carried into the findings. The judge advised counsel that he had overlooked some matters which should be included in the findings of fact and the judgment. There was no discussion or talk of the merits of the case. Counsel for the corporation immediately advised the attorney for appellant, by letter, of the substance of the meeting between the judge and himself. At the motion for a new trial, the question of the propriety of the meeting between counsel and the judge was urged by the attorney for appellant. At that time the judge stated:

"The Court: Ordinarily, I wouldn't answer this ridiculous statement of counsel that there was any misconduct, but I think I should answer it in this respect: Of course, how is counsel going to know how to prepare the findings unless the court tells counsel how to prepare the findings? The decision had already been made. If this had been before the case was decided, why, of course, it is a serious matter, and I never talk to counsel before a decision is made unless the other counsel is present. But the decision was made, and Mr. d'Orr called me up about the findings, and I told him to come up and I would tell him what to put in the findings, and after I went over my notes which I have here, there were one or two items which were not covered in the minute order, and I told him what to put in as to those items. That is all there is to it. The findings are the Court's findings, and they are not the findings of the attorney, but the Court's findings. It is the duty of the Court to prepare findings. That is it. That is what happened. If the findings are wrong in any respect why, of course, the Court can at this time correct them, because you are making a motion for a new trial, and if the Court has made any mistake in any respect, why, I would be happy to correct it."

The judgment, as signed, provided that the appellant take nothing; that the lease was terminated on August 8, 1954; it awarded the corporation $5,680 as damages for the conversion by appellant of its worm farm property, less $117

rental due her for the first seven days of August, 1954, plus interest on the net sum at the legal rate; quieted title in the corporation to the fund in the bank amounting to $4,691.20, and held appellant to have no interest therein; awarded the corporation interest on the funds withheld; ordered the Bank of America to deliver the fund to the corporation; enjoined appellant from interfering with such delivery and awarded costs to the corporation, Johnson, Andrews and the bank.

Appellant contends that (1) the lease was cancelled by the board of directors of the corporation on July 31, 1954; (2) there was a waiver of the defense of lack of authority of the corporation to enter into the contract by the failure to plead such defense; (3) the corporation is estopped to raise the defense of lack of authority to enter into the contract; (4) there was no conversion of the corporation's property on the Null property; (5) there was a violation of the rules of professional conduct; (6) secondary evidence of writings was introduced without notice to produce the original, and (7) it was error to permit the witness Johnson to use notes of a memorandum and then to restrict appellant's right to cross-examine the witness upon the memorandum.

As to the first contention, suffice it to say that the testimony was conflicting, and the judge saw fit to believe those witnesses whose testimony indicated that there was no agreement concluded at the meeting of July 31, 1954, and by the same token, there was no cancellation or surrender of the lease at that meeting, and no contract thereafter was approved or executed by the corporation. Finding, as the court did, upon substantial evidence, the rule of law is well set forth in *Spinney* v. *Downing,* 108 Cal. 666, at pages 668-669 [41 P. 797], where the court said: "It is a general rule to which this case presents no exceptions that, when it is a part of the understanding between the parties that the terms of their compact are to be reduced to writing and signed by the parties, the assent to its terms must be evidenced in the manner agreed upon, or it does not become a binding or completed contract. This is essentially true when, as here, the proposed contract contains reciprocal stipulations and covenants upon the part of each as a consideration for the acts of the other. (*Ambler* v. *Whipple,* 20 Wall. (U.S.) 546 [22 L.Ed. 403] ; *Fuller* v. *Reed,* 38 Cal. 99 ; *Morrill* v. *Tehama etc. Co.,* 10 Nev. 125.) The case last cited is much in point, the facts not being essentially dissimilar to those of the case at bar. In that case the parties agreed upon the terms of a

contract for the sale and delivery of a certain quantity of wood by plaintiff to defendant, but it was understood that the contract should be put in writing and signed by both parties. It was accordingly reduced to writing, and was duly executed by defendant, but was not signed by plaintiff, nor did the latter give a bond as was required for the faithful performance of the contract. He did, however, commence at once to deliver the wood, and continued to deliver it until stopped by the defendant. He brought an action for the breach of the contract, and in passing upon the case on appeal the Supreme Court of Nevada say:

" 'From the facts thus found we think, independent of the giving of the bond, that the contract declared on was never completed. It is true the parties verbally agreed to the terms of the contract as stated in the complaint, but it was to be reduced to writing and signed by both parties. And it was signed by McDonald as the agent for defendant, but the plaintiff, for what reason does not appear, failed to sign it at the same time. True, four days afterward he went to Waters' office for the purpose of signing it, and, failing to find it, proceeded to act under its terms. But the contract thus prepared was to be signed by both parties; it contained mutual obligations, each of which being the consideration of the other; . . . and as the plaintiff failed thus to sign it, no reciprocal assent thereto can be implied. There is no contract unless the parties thereto assent; and they must assent to the same thing, in the same sense. (1 Parsons on Contract, 475.) It is essential to the existence of every contract that there should be a reciprocal assent to a definite proposition, and when the parties to a proposed contract have themselves fixed the manner in which their assent is to be manifested, an assent thereto, in any other or different mode, will not be presumed. Notwithstanding the instrument declared upon was fully executed on the part of defendant, the contract was still incomplete and neither party bound thereby.' "
(See also *Sesma* v. *Ellis*, 38 Cal.App.2d 139 [100 P.2d 816] ; *Sam Aftergut Co.* v. *Mulvihill*, 25 Cal.App. 784 [145 P. 728] ; *Dillingham* v. *Dahlgren*, 52 Cal.App. 322 [198 P. 832] ; *Mercantile Trust Co.* v. *Sunset etc. Co.*, 176 Cal. 461 [168 P. 1037] ; *Dexter* v. *Ankiewicz*, 26 Cal.App.2d 326 [79 P.2d 400] ; *Durst* v. *Jolly*, 35 Cal.App. 184 [169 P. 449].)

As to the second and third contentions, the trial court held, and we believe properly so, that there was no contract made between the directors and the appellant on July 31, 1954,

and consequently, there is no merit whatsoever to such contentions.

The fourth contention of appellant, reduced to very simple terms, is that since she had not specifically granted to the lessees in the lease of August 1, 1953, a right-of-way or easement to use the driveway for the purposes of ingress and egress from the Null lot, she could not have converted the lessees' property on the Null lot, or, in other words as counsel for the respondents has put it:

"Irrespective of the *facts*, since the lessees had no written road-permit from me in hand, valid on August 8, 1954, to drive back to the Null lot over my driveway (although if they drove back to the *Kessinger* lot, the truck would also be at the *Null* lot), my expulsion of the lessees from the driveway amounted to a conversion of the property on the *Kessinger* lot only."

The court, in *Zaslow* v. *Kroenert*, 29 Cal.2d 541, at pages 549-550 [176 P.2d 1], said, in determining what was necessary to establish a conversion:

"Stated generally, 'conversion is any act of dominion wrongfully exerted over another's personal property in denial of or inconsistent with his rights therein.' (Citing cases.) The liability of one in possession of real property for the conversion of personal property which he finds upon it, depends, in most cases, upon a determination of whether the conduct of the defendant indicates an assumption of control or ownership over the goods. It is clear that, under some circumstances, refusal of one in possession of real property to permit, upon demand, the owner of chattels which were left there to remove his goods, constitutes conversion. (Citing cases.)

". . . . . . . . . . . .

". . . To establish a conversion, it is incumbent upon the plaintiff to show an intention or purpose to convert the goods and to exercise ownership over them, or to prevent the owner from taking possession of his property."

The trial judge believed from the evidence that appellant was not just intermeddling or interfering in an unsubstantial way with the corporation's property, but rather she was exercising dominion over, and assumed control of the property in question, and certainly prevented the true owners from taking possession of the same. In the case of *Gruber* v. *Pacific States Sav. & Loan Co.*, 13 Cal.2d 144 [88 P.2d 137], the court said (at pages 147-149): "Plaintiff was not re-

quired to resort to physical violence to remove his property over the defendant's opposition thereto. In a somewhat analogous situation, it was held in *Donoghue* v. *Kremmel,* 121 Cal.App. 208 [8 P.2d 918] . . . , that where a lessor told the lessee to keep out of the demised premises and refused him permission to enter, a constructive eviction resulted and that there was no real difference between physically removing the lessee and preventing his entry. It was further declared that the lessee was 'not obliged, nor is he encouraged by law, to wage a deadly conflict to obtain entry to the demised premises.' The defendant's refusal in the instant case to permit the plaintiff to have access to his equipment or to remove the same while an arrearage in rent existed constituted an improper and wrongful exercise of dominion over the plaintiff's property in violation of his rights as owner and, as shall presently be shown, amounted to a conversion rendering defendant liable for whatever damage resulted therefrom—here, the market value of such equipment all of which, as indicated, was ultimately lost to the plaintiff.

"As stated, the fact that plaintiff was in arrears in his payment of the rent of the demised real property did not warrant defendant's exercise of dominion over plaintiff's personal property located on the premises. Adequate remedies exist to protect a lessor in such a situation. But, it is definitely settled in this state that a landlord has no lien on the tenant's property for unpaid rent. (Citing cases.) It is not claimed that any was here reserved. Nor do we think that a manual taking or destruction is essential to a conversion. In 2 Tiffany, Landlord and Tenant, page 1673, the following appears: 'The landlord is, it has been held, guilty of conversion if he refuses to allow the tenant to remove his goods during the tenancy, or at a subsequent time when the latter has a legal right to do so. . . .'

"It is settled that conversion is any act of dominion wrongfully exerted over another's personal property in denial of or inconsistent with his rights therein. (Citing cases.) In the case last above cited [*Hull* v. *Laugharn,* 3 Cal.App.2d 310, 315 (39 P.2d 478)], the rule is thus stated: 'Conversion consists in the unwarranted interference by defendant with the dominion over the property of plaintiff, from which injury to the latter results. . . . Dominion is defined in law lexicons as "perfect or complete property or ownership in a thing" (Bouvier's Law Dict.); "complete ownership; absolute property" (Anderson's Dict. of Law); and "ownership or right

to property'' (Black's Law Dict.)'  The acts of the defendant's watchman and assistant cashier, in the immediate proximity of the equipment and elsewhere, in refusing to permit plaintiff to remove any portion thereof in furtherance of the written threat to sell all of the equipment, obviously precluded the plaintiff from using and enjoying his 'complete property or ownership' of such equipment and definitely constituted an 'interference' with plaintiff's 'dominion over the property' within the meaning of the authorities.

"As stated above, it is not necessary that there be an actual manual taking of the property.  In *McCaffey Canning Co.* v. *Bank of America,* 109 Cal.App. 415, 424 [294 P. 45] . . . , it is stated, among other things, that 'Any wrongful assumption of authority over chattels, inconsistent with another's right of possession or subversive of his vested interest therein, amounts to conversion. . . . An unjustified claim of title may amount to conversion. . . .'

"In *Dodge* v. *Meyer,* 61 Cal. 405, 420, the rule is stated in the following form: ' "The action of trover being founded on a conjoint right of property and possession, any act of the defendant which negatives or is inconsistent with such right amounts in law to a conversion.  It is not necessary to a conversion that there should be a manual taking of the thing in question by the defendant; it is not necessary that it should be shown that he has applied it to his own use.  Does he exercise a dominion over it in exclusion or in defiance of the plaintiff's right?  If he does, this is in law a conversion. . . ."  It is contended that Meyer never had possession of the wheat, never handled it, and therefore did not convert it.  Some of the cases just above cited expressly held that this is not necessary.  To these we add *Connah* v. *Hale,* 23 Wend. (N.Y.) 462, where it was held that to constitute a tortious taking it was not necessary that there should be an actual manucaption of the goods.  A mere claim of dominion, an intention intimated to interfere with goods under a pretense of right or authority, amounts to a constructive trespass, and no demand is necessary before bringing an action of trover.'

"*Lowe* v. *Ozmun,* 3 Cal.App. 387, 394 [86 P. 729] . . . , quotes the foregoing as the rule in this state.  We repeat that the acts and conduct of the defendant, operating through its agents, improperly and wrongfully interfered with plaintiff's absolute ownership of and dominion over his equipment

and constituted a conversion thereof which ultimately reacted to plaintiff's financial detriment.''

In the case of *Pearl* v. *Figoni*, 49 Cal.App.2d 662 [122 P.2d 385], Pearl had rented a house from Figoni and was two months in default in the rent, when Mrs. Pearl, with a moving van, went to the house to remove their furnishings. They were met by Figoni, who repeatedly made such statements as: '' 'No, don't move anything because you still owe me rent'; 'You cannot do it'; 'They owe me the money and you cannot touch anything'; 'You cannot move'; 'No, you can not take a thing'; 'No, don't take a thing'; 'Not one stick of furniture goes out of here, and if it does, I call the law.' ''

Much of the language used in the Pearl case is similar in nature to the language of appellant on August 8, 1954, when she directed the respondents to leave the property. The court in the Pearl case held that the matter was controlled by the Gruber case, *supra,* and affirmed the judgment for the plaintiffs. (See also *Mears* v. *Crocker First Nat. Bank*, 84 Cal. App.2d 637 [191 P.2d 501]; *Edwards* v. *Jenkins*, 214 Cal. 713 [7 P.2d 702]; *Wolfe* v. *Willard H. George, Inc.*, 110 Cal. App. 532 [294 P. 436]; *Atwood* v. *Southern California Ice Co.*, 63 Cal.App. 343 [218 P. 283]; 148 A.L.R. 650.)

██ Under the circumstances of this particular case, we believe the fact that some of the corporation's property was on the Null lot, in which the appellant had no legal interest, does not necessarily preclude her from being guilty of conversion of the corporation's property on that lot. She not only exercised and assumed dominion over that property of the corporation on the Null lot, but she held it, and at the time of trial, still held it. The corporation had the lot leased from the Nulls and the personal property thereon belonged to it. The appellant had no right of dominion over the Null lot, nor anything on it. ██ If all of the other requirements of a conversion are present, it is immaterial that the property in question at the time of the conversion may be in the actual possession of a third party. (*Brinkley-Douglas Fruit Co.* v. *Silman*, 33 Cal.App. 643 [166 P. 371].)

██ Furthermore, the appellant in this case had, for months, acquiesced and participated in the lessees' use of the driveway to farm both lots. She participated in the farming activities actively, and knew that the Null lot was farmed from the driveway on her property. She knew the value of the Null farm, and even mentioned at the directors' meeting that she would like to have it for herself. The very notice

which she gave to the corporation to quit provided, in substance, that the corporation would have three days within which to pay or quit, and apparently, had the corporation not been stopped by her, the property of the corporation would have been removed from both lots within the three-day period. ■ The appellant raised the issue which invited the application of the doctrine of estoppel, and under such circumstances it is not necessary that the plaintiff plead estoppel. (*Bank of America* v. *National F. Corp.*, 45 Cal. App.2d 320, 332 [114 P.2d 49] ; *Corporation of America* v. *Harris*, 5 Cal.App.2d 452 [43 P.2d 307].)

Coming to the contention that there was a breach of ethics by counsel for the respondent and the trial judge, it would be a strange situation, indeed, if a trial judge, after deciding a case on the merits, were to be precluded from directing what the findings should contain. Rule 19 of the Rules for Superior Courts provides, in part, as follows: ''When written findings of fact and conclusions of law are required, counsel for the prevailing party shall, within ten (10) days after announcement of decision, unless otherwise ordered, prepare, serve and submit to the court proposed written findings of fact and conclusions of law together with the proposed judgment or decree.''

■ It is the duty of the trial judge to see to it that the findings are in conformity with his views of the facts and the law in the case. ■ The appellate courts have repeatedly held that the trial judge may cause the findings to be changed, revised or rewritten, and he may discard everything by way of proposed findings presented to him by counsel and draw his own. Certainly, if he can as indicated direct in the first instance what the findings shall contain, we see nothing unethical or wrong in the judge's advising counsel what to put in the findings, as was done in this instance.

■ The next contention is to the effect that there was secondary evidence of writings introduced without any notice to produce. The first of such instances which deserves any consideration at all involved the notice and demand of the lessees served upon appellant on August 9, 1954, after the corporation had been excluded from the properties the day before, wherein the corporation demanded the right to remove its property from the lots. Upon there having been exhibited to him the copy of the notice, counsel for the appellant hesitated as to whether he had the original thereof, and pretended apparently that he did not ''even recognize

the document." After considerable evasiveness and failing to give a straight-forward yes or no answer as to whether he had the original of the notice, he said, "I don't know that I ever had the original." The court then said, "I will take your answer to mean that you don't have the original." Counsel for appellant replied, "I will make the statement that I don't know that I ever had the original of this document." The court then observed that the lessees had alleged in their complaint, and the lessor had admitted in her answer, that said Notice and Demand of August 9, 1954, was served upon her, and ruled that such facts, "together with the evidence introduced so far, . . . lays a sufficient foundation for the introduction of this document."

A copy of the notice was attached to the complaint and surely counsel could not contend that he was taken by surprise or that any prejudicial error resulted from the introduction of the copy of such notice.

With reference to a copy of a letter which had been written, counsel for appellant was asked if he had the original, to which he replied, "I don't think so." The court permitted the copy of the letter in question to be introduced. The correct rule is stated in *Silveyra* v. *Harper*, 82 Cal.App.2d 761, at page 768 [187 P.2d 83], where the court said:

"When respondent's counsel, during the trial demanded the production of a document, appellant's counsel did not complain that he needed further time to secure the document, or that he had been taken by surprise and damaged by this late request, but took the position that 'there never was any such document' and 'there is no such document.' In other words, appellant's position was that no such document had ever been executed. How appellant could have been prejudiced by not being given reasonable notice to produce a document appellant claimed did not exist does not appear. Obviously, no prejudice could have resulted and it was not error to admit secondary evidence of the contents of the contract. (See generally, IV Wigmore on Evidence, 3d ed., § 1208, p. 375; *Jones* v. *Jones*, 38 Cal. 584; *Burke* v. *Table Mountain Water Co.*, 12 Cal. 403.)"

The other instance of a copy being introduced is so trifling as to merit no consideration here.

Coming to the last contention that the witness used a memorandum to testify from and that appellant was not then permitted to cross-examine the witness on such memorandum, the record of the case does not bear out appellant's asser-

tion. The witness Johnson had before him a "work-sheet or rough inventory" and also a "summary" thereof, both of which he had made. Counsel for the appellant was shown a copy of the "work-sheet or rough inventory" and was offered a copy of the "summary." Johnson testified and used the work-sheet but not the summary, when he testified, and when respondents' counsel offered the summary in evidence, it was refused admission upon objection from the appellant. The court ruled, at the request of the attorney for the appellant, that it might be marked for identification; however, the clerk did not physically mark it at the time. When appellant's counsel started his cross-examination of Johnson, he inquired as to whether the summary had been "turned in to the Court," and received a negative answer, the court saying further that it was not in evidence and there was no reason to admit it for identification. Counsel then proceeded into a long and searching cross-examination, and during such examination never once indicated that he was handicapped in any way because of the court's ruling.

As to the fund for "liquidated damages" in the bank account, the corporation had judgment quieting its title to the fund accumulated. That feature of the case is controlled by such authorities as section 1670, Civil Code, *A-1 Garage* v. *Lange Investment Co.*, 6 Cal.App.2d 593 [44 P.2d 681], section 1671, Civil Code and *Sprague* v. *Fauver*, 71 Cal.App.2d 333 [162 P.2d 865].

We find no prejudicial error in any of the contentions of appellant.

The judgment is affirmed.

White, P. J., and Doran, J., concurred.

A petition for a rehearing was denied July 16, 1957, and appellant's petition for a hearing by the Supreme Court was denied August 13, 1957.