**William B. EVANS, Plaintiff,**

v.

**CARROLL & CO., Defendant.**

Civ. No. 47.

United States District Court
D. Montana,
Billings Division.

Sept. 30, 1957.

Cooke, Moulton, Bellingham & Longo, Billings, Mont., for plaintiff.

Wiggenhorn, Hutton, Schiltz & Sheehy, Billings, Mont., for defendant.

JAMESON, District Judge.

Defendant has moved the court for an order setting aside the verdict and judgment for plaintiff and for judgment in accordance with defendant's motion for directed verdict, or in the alternative for a new trial. Twelve grounds are specified in the motion for a directed verdict and nineteen errors are specified as grounds for a new trial.

Plaintiff's complaint alleges that on or about February 7, 1956, the plaintiff ordered from defendant 75,000 shares of common stock of Colotah Uranium Co., Inc., and completed the purchase thereof by payment on March 3, 1956 of the sum of $5,250 as the full purchase price; that defendant accepted payment and purchased the stock for plaintiff on March 6, 1956 when certificate was issued in plaintiff's name; that plaintiff thereupon became the owner and entitled to immediate possession of the stock; that the defendant thereafter received the certificate but wrongfully retained possession and failed and refused to deliver

possession although demand therefor had been made by plaintiff. Plaintiff sought actual damages in the sum of $19,500 as the value of the stock at the time of its conversion and a like amount as exemplary and punitive damages.

Defendant denied the allegations of plaintiff's complaint and alleged that shortly after April 12, 1956, the plaintiff ratified the purchase of the stock certificate subject to the limitation that such certificate could not be sold or transferred without the prior consent of William Branch or Howard P. Carroll by accepting the stock and endorsing the certificate and offering to trade it for other stock held by William Branch.

The evidence may be summarized as follows: Through conversations with Sidney Kurth, president of Colotah, and Robert Hartpence, Billings manager of Carroll & Co., plaintiff and Gregory Baldridge, residents of Billings, Montana, became interested in the purchase of Colotah stock. According to plaintiff and Baldridge, they were told by Hartpence that he did not have any stock available and he advised them to call Denver. It is not clear from their testimony whether they were advised to call "defendant's Denver office" or Howard P. Carroll, who was the president of defendant, a Colorado corporation with its principal office at Denver. On February 7th, Baldridge, acting for himself and plaintiff, had a long distance telephone conversation with Carroll regarding the purchase of Colotah stock. Baldridge testified that he was advised by Carroll that Baldridge and plaintiff would be "protected at 7¢ per share and that he might possibly get a lower price", and that "he would have to talk to Mr. Branch, his partner." According to Baldridge and plaintiff there was no agreement that the purchase of the stock would be subject to any limitation with respect to resale. This is disputed by Carroll, but for the purpose of this motion, the evidence most favorable to plaintiff must be accepted.

On March 3rd, Baldridge, again acting for himself and plaintiff, mailed a check for $10,500 to defendant in payment of the stock. This check was received in the ordinary course of mail, was endorsed by H. P. Carroll as president of the defendant corporation, and delivered to Branch. This check, which was received in evidence, bears the endorsements "Carroll & Co. by Howard P. Carroll", William L. Branch, and Colorado State Bank. It was paid by Security Trust & Savings Bank, Billings, Montana, on March 12th. Branch testified that he deposited the check to his credit in the Colorado State Bank on March 7th. Defendant did not have an account in that bank and received no portion of the purchase price.

Branch arranged for the issuance of 75,000 shares of stock to plaintiff and 75,000 shares to Baldridge from stock owned by Branch and Carroll individually. Plaintiff and Baldridge testified that they understood they were dealing with Carroll as president of defendant corporation. Carroll testified that he was acting individually rather than for the corporation in this transaction. Branch was not interested in the defendant corporation.

The certificate issued to plaintiff, which was received in evidence, was dated March 6, 1956, and bears plaintiff's endorsement in blank. No limitation with respect to resale appears on the certificate, but there was also received in evidence a receipt executed by Sidney P. Kurth, written on stationery of Wm. L. Branch, and reading as follows:

"Received this 12th day of April, 1956, from Wm. L. Branch the following stock certificates of Colotah Uranium Co., Inc.:

| "Certificate No. | Issued to | Shares |
|---|---|---|
| "5012 | Stuart W. Conner and Betty Lu Conner | 100,000 |
| "5014 | Greg Baldridge | 75,000 |
| "5015 | Wm. B. Evans | 75,000 |

"It was understood and agreed at the time the shares represented by these certificates were purchased that the same were being acquired for investment and not for early resale, and it is therefore understood that this delivery is being made to you with the further agreement that you will retain possession of the shares in order that the same shall not be sold without the prior consent and agreement of the vendors, Wm. L. Branch and Howard P. Carroll.

"Sidney P. Kurth."

Plaintiff had purchased other stock from defendant through Robert Hartpence, manager of the Billings branch office, and orders of confirmation and certificates were mailed to plaintiff from defendant's home office in Denver. Neither plaintiff nor Baldridge received any confirmation from defendant of the purchase in question, and no certificates were mailed or otherwise delivered to either of them.

No demand was made upon defendant for the stock, although the nondelivery of the stock was discussed among plaintiff, Baldridge, Hartpence and Kurth. About the middle of March, Hartpence suggested to plaintiff and Baldridge that they call Branch in Denver, advising them that Carroll was out of town. Baldridge called Branch's office and found that Branch also was out of town. He talked with someone in Branch's office who promised to look into the matter. Kurth was making frequent trips to Denver. Plaintiff and Baldridge testified that they asked Kurth to check on their stock.

On April 12th, Kurth obtained the certificates from Branch and brought them to Billings. Within a few days thereafter Kurth told plaintiff and Baldridge he had their stock. They went to his office and examined the certificates and receipt. Both testified that they then learned for the first time of the limitation placed upon resale and that they had not at any time agreed to this limitation. Plaintiff testified he demanded the certificate from Kurth, but Kurth did not deliver it by reason of the receipt attached thereto and quoted above. Plaintiff and Baldridge testified that they had not requested Kurth to obtain the stock certificates for them but had merely asked him to "check on the matter". Plaintiff testified further that Kurth told him there was no chance for him to get the certificate at that time.

There is no evidence that the defendant ever had the stock certificate in its possession, and Carroll testified positively that the company did not at any time have the stock. It is undisputed that the stock certificate was in the possession of William L. Branch from its issuance on March 6, 1956 until its delivery to Kurth on April 12, 1956, who had it in his possession until he mailed it back to Branch sometime in July. Branch then retained possession until the time of trial.

About the first of May plaintiff called Branch and proposed a trade of a portion of his Colotah stock for stock in another company. Branch indicated a willingness to trade but said he would have to confer with Carroll. Plaintiff testified he called Branch because he understood from Hartpence that Carroll was out of town and also because he was advised by Hartpence that Branch would be more reasonable to deal with. Upon the assumption that he had made the trade, plaintiff called at Kurth's office and endorsed the stock certificate. A week or so later plaintiff called Branch again and was informed that Carroll was unwilling to go through with the trade. Carroll testified that he could not legally do so at that time, because his company was then engaged in the underwriting of the other stock.

Plaintiff testified further that subsequently, probably around May 9th or 10th, he tried to call Carroll a number of times but each time was informed that Carroll was not in. This action in conversion was started on August 7, 1956.

The market value of the Colotah stock on pertinent dates was as follows: March 6th, 23 cents (highest sale); March 7th,

24 cents; March 12th, 26 cents; April 12th, 20 bid, offered at 25; April 13th, 18 bid, offered at 22; April 16th, 18 bid, offered at 23. In June Colotah stock sold from a low of 7½ cents to a high of 17 cents; in July, from a low of 6 cents to a high of 11 cents; and on August 7th, the price was 4 cents a share.

Although Kurth had represented defendant as attorney in at least one other matter, he was not regularly employed by defendant and was not acting as agent or attorney of defendant with respect to the transaction in question, unless an inference of such representation may be drawn from Branch giving Kurth the stock certificates to bring to Billings. It is undisputed that plaintiff did not at any time make any demand upon defendant for the stock certificate, unless the demand upon Kurth would be construed as such demand.

The jury found that there had been a conversion on March 12, 1956, and assessed the damages at $15,000.

Plaintiff contends (1) that no demand was necessary and that failure to deliver the stock after payment in itself constituted a conversion; (2) that a demand was made upon Kurth for the stock; (3) and that any demand upon defendant would have been futile.

Defendant contends (1) that defendant did not at any time have the stock in its possession; (2) that if there were any possession, whether actual or constructive, it was rightful and that a demand accordingly was necessary for an action in conversion; and (3) that in any event plaintiff ratified the transaction (a) by failure to repudiate promptly after learning, about April 14th, of the limitation on resale; and (b) by offering to trade with Branch and in endorsing the certificate for that purpose.

Plaintiff contends that ratification requires an affirmative act and that plaintiff's offer to trade was simply an effort to make the most of a bad bargain and could not be construed as a ratification.

[1] For the purpose of this motion, all conflicts in the evidence must be viewed in the light most favorable to the plaintiff. Accordingly it must be assumed that on February 7, 1956, plaintiff ordered the stock by telephone from Howard P. Carroll in Denver; that Carroll was acting in his capacity as president of the defendant corporation, a broker, and that there was no agreement for limitation as to resale. On March 3rd check in payment was mailed to the defendant, was endorsed by the defendant and delivered to William L. Branch, who deposited the check to the credit of his own bank account on March 7th. On March 6th, Branch arranged for the issuance of the stock to plaintiff from stock owned by him and Carroll individually. There is no evidence that the defendant had any interest in the stock, received any part of the purchase price for commission or otherwise, or ever had the stock in its actual possession.

In prior transactions, which had been handled through defendant's Billings office, orders of confirmation and the stock certificates were mailed from defendant's Denver office to plaintiff within a reasonable period. In this instance neither confirmation order nor stock certificate was ever delivered by mail or otherwise to plaintiff.

The stock was retained in Branch's possession from March 6th to April 12th, when it was handed by Branch to Kurth to bring to Billings, with the receipt reciting the limitation on resale. Plaintiff first learned of this limitation within a few days thereafter when he called at Kurth's office. Kurth retained the stock until sometime in July when he returned it to Branch.

The jury found a conversion on March 12th. This was the date the check in payment of the stock cleared the Billings bank. Plaintiff suggests in his brief that "the jury unquestionably were influenced by this fact and furthermore by the fact that the stock should have been delivered by this time."

Assuming that the stock should have been delivered by March 12, two pertinent questions arise: (a) what did plaintiff, either personally or through his

agent, do thereafter to demand his stock? (b) what did he do after learning on or about April 14 of the limitation on re-sale?

Between March 12 and April 14, plaintiff and Baldridge discussed non-delivery of the stock with Kurth and Hartpence, defendant's local manager. Hartpence advised calling Branch because Carroll was out of town. Baldridge called Branch around the middle of March but did not reach him. It is significant that the call was made to Branch rather than defendant's office. There is no evidence that Hartpence participated in any way in the transaction other than making suggestions with respect to calling Carroll or Branch. Kurth was making frequent trips to Denver. Prior to the April 12th trip plaintiff requested Kurth to check on his stock. This is all the testimony with respect to any activity prior to April 14th. Certainly it did not constitute a demand upon defendant for the stock.

What happened subsequent to April 14th when plaintiff learned of the limitation on resale? He testified he demanded the stock certificate from Kurth, but under the receipt Kurth had given Branch, any authorized delivery would have been subject to the limitation on resale. About May 1, plaintiff called Branch and proposed a trade. This call to Branch was made at Hartpence's suggestion because Carroll was out of town and Branch would be more reasonable to deal with. Again it is significant that no call was made to defendant's office. Plaintiff had another telephone conversation with Branch about a week later when he learned Carroll would not agree to trade. Around May 9 or 10 plaintiff on three or four occasions attempted to call Carroll but was told by the receptionist that Carroll was not there, after inquiry had first been made as to the caller's identity. Nothing further was done until suit was started on August 7th. In particular no communication by letter or wire was ever sent defendant subsequent to the letter transmitting the check on March 3.

Do these facts sustain plaintiff's position that no demand was necessary or that the demand upon Kurth was a demand upon defendant?

■■ Where possession is obtained rightfully in the first instance, a demand and refusal ordinarily are necessary in order to put the party charged with conversion in the wrong and give rise to the cause of action. Duckett v. Biggs, 1920, 57 Mont. 443, 188 P. 938; Scott v. Waggoner, 1914, 48 Mont. 536, 139 P. 454, L.R.A.1916C, 491; Hennessy Co. v. Wagner, 1923, 69 Mont. 46, 220 P. 101; Beyerlein v. Whitcomb, 1933, 95 Mont. 293, 26 P.2d 349; Jeffries v. Pankow, 1924, 112 Or. 439, 223 P. 745, 229 P. 903; Fletcher v. Pump Creek Gas & Oil Syndicate, 1928, 38 Wyo. 329, 266 P. 1062, 61 A.L.R. 615; Flennaugh v. Heinrich, 1948, 89 Cal.App.2d 214, 200 P.2d 580; 89 C.J.S. Trover and Conversion § 55, p. 559; 53 Am.Jur. 882, Trover and Conversion, § 88. Where the initial taking is wrongful, or where there is an independent act of conversion through assertion of title or exercise of dominion inconsistent with the rights of plaintiff, or where it is clear that a demand would have been useless or unavailing, a demand is not necessary. 89 C.J.S. Trover and Conversion §§ 55, 57, pp. 558, 561.

It is undisputed that the defendant did not at any time have actual possession of the stock certificate. Assuming constructive possession through Branch, such possession was clearly rightful in the first instance. Plaintiff does not contend otherwise. In his complaint plaintiff alleges a demand and refusal. No demand was proved. Plaintiff contends, however, that under the facts proved no demand was necessary and that if made, it would have been useless and unavailing.

Plaintiff relies upon many cases which support the rules that (1) as between a broker and customer who has paid for his stock in full, the latter is the owner of the stock; and (2) as between the broker and his cash customer, the latter is entitled to immediate delivery of his stock. The cases cited include three actions in

conversion, i. e., Edwards v. Jenkins, 1932, 214 Cal. 713, 7 P.2d 702; Elliott v. Seattle Co., 1934, 178 Wash. 94, 34 P.2d 442; and Mundheim v. C. A. Bertrand & Co., City Ct.1920, 180 N.Y.S. 871. In my opinion the facts in all of the cases cited by plaintiff are distinguishable, and none of them hold that the mere retention of stock dispenses with the necessity of a demand.

■ To avoid the necessity of a demand, some affirmative act of conversion on the part of the defendant is necessary. The general rule is well stated by American Jurisprudence as follows:

"Some affirmative act on the part of the defendant is usually regarded as necessary to constitute a conversion. A mere intention to do a particular act, or a mere nonfeasance, even though it is a neglect of a legal duty, is ordinarily insufficient to support the maintenance of an action for conversion." * * * "The mere breach of a contract does not necessarily constitute a conversion. This rule is particularly applicable to a failure to perform an act obligatory by contract, since some affirmative act on the part of the defendant is usually regarded as necessary to constitute a conversion."

53 Am.Jur. p. 821-2. See also Vissenberg v. Bresnahen, 1949, 65 Wyo. 367, 202 P. 2d 663, rehearing denied 203 P.2d 966; Emmert v. United Bank & Trust Co. of California, 1936, 14 Cal.App.2d 1, 57 P. 2d 963; Williams v. International Harvester Co., 1943, 172 Or. 270, 141 P.2d 837; 116 A.L.R. 871.

In Kee v. Becker, 1942, 54 Cal.App.2d 466, 129 P.2d 159, 162, the court clarified earlier California decisions which had stated, "A mere claim of dominion, an intention intimated to interfere with goods under a pretense of right or authority, amounts to a constructive trespass, and no demand is necessary before bringing an action of trover." In the Kee case, the court held that no case of which it was aware "warrants so broad a statement of what amounts to conversion", and the court was of the opinion

that the language in the earlier cases was not to be taken literally.

■ Failure to deliver the stock certificate was not sufficient in itself to obviate the necessity of a demand, even though payment therefor had been made in full. In the absence of an affirmative act of conversion, a demand and refusal were necessary to give rise to a cause of action in conversion.

In support of their contention that a demand would have been useless and unavailing, counsel for plaintiff state that, "A long series of cases in California are support for the general rule that the customer's demand in an action for conversion is unnecessary where the proof shows that a demand would have been futile", citing the case of Yamada v. Masue Osawa, 1936, 12 Cal.App.2d 133, 54 P.2d 1135. In that case the futility arose from the fact that the defendant had sold the stock in question and would have been unable to comply had the demand been made. Likewise Mier v. Southern California Ice Co., 1922, 56 Cal. App. 512, 206 P. 83, cited by the court in the Yamada case, involved a situation where the property in question was placed beyond the defendant's control by sale and delivery to another person, thereby obviating the need for a demand. Carver v. Ketchum, 1933, 53 Idaho 595, 26 P.2d 139, also cited in the Yamada case, involved a claim of title and asserted ownership by the defendant along with a positive act of dominion, which the court said was sufficient to prove a conversion without the necessity of a demand. Piazzek v. Harman, 1908, 79 Kan. 855, 98 P. 771, cited by plaintiff was also a case where the defendant maintained possession under a claim of right. In Humbert v. Mason, 1909, 46 Colo. 430, 104 P. 1037, the defendant had cashed a draft and converted the money to his own use. In Gottlieb v. Hartman, 3 Colo. 53, 22 P.St.Rep. 53, the defendant had pawned the property in question and put it out of his control.

In all of the cases cited by plaintiff, there was an actual conversion either through some disposition of the property so that the defendant was unable to com-

ply with a demand or positive evidence that the defendant asserted ownership or right of possession. Corpus Juris Secundum summarizes the general rule of these cases as follows:

"A demand and refusal are not essential to a conversion where it is clear that a demand would have been useless or unavailing, if it had been made. This may be either because defendant has asserted an adverse claim of ownership or right of possession in himself or in a third person, or because it is shown that defendant had placed it beyond his power to comply with a demand if made, as by having placed the property out of his possession and control." 89 C.J.S. Trover and Conversion § 57, p. 561. See also: 53 Am. Jur. 880–882, Id., § 88.

■ These facts are not present in the instant case. To justify a finding that a demand would be useless or unavailing, there must be more than conjecture that the defendant would have refused if demand had been made. There must be some affirmative act of conversion, or the defendant must have placed the property beyond his power to comply with a demand if made.

■ Plaintiff further contends that if a demand were necessary, such demand was made upon defendant through Kurth. In my opinion the evidence was insufficient to establish that Kurth was the agent of defendant in this transaction. Moreover, the law is well settled that in order for a demand to be effective it must be made upon a person who has possession or control of the property and who would be obligated to surrender it with power to do so if he would; if demand be upon an agent or employee the power to surrender the property must be within the scope of his agency or employment. 89 C.J.S. Trover and Conversion § 58, pp. 562, 563. See also: 53 Am.Jur. 884, Id., § 91; Fletcher v. Pump Creek Gas & Oil Syndicate, supra, 266 P. at page 1065, 61 A.L.R. 621, 627; Mueller v. Technical Devices Corp., 1951, 8 N.J. 201, 84 A.2d 620.

At most, Kurth was authorized by Branch to surrender the stock subject to the limitation as to resale, but not otherwise. There is no evidence that Kurth was authorized by defendant to deliver the stock or that plaintiff assumed or had reason to believe Kurth had such authority. Any demand made upon Kurth, under the circumstances, would be ineffective.

■ There is a complete absence of proof that plaintiff at any time prior to suit made any demand upon defendant for the stock in question by letter, telegram or orally. I cannot escape the conclusion that under all the circumstances of this case such a demand was necessary to establish a cause of action for conversion. The defendant's motion for judgment in accordance with its motion for a directed verdict accordingly is granted on the ground that plaintiff failed as a matter of law to prove that he made a demand upon the defendant for the property alleged to have been converted, such demand being required by law. Having reached this conclusion, it is unnecessary to consider the other grounds of defendant's motion or specifications of error.

The defendant will prepare judgment in accordance with this opinion.